**JEFFERSON CHEMICAL COMPANY, Inc.**

v.

**M/T GRENA et al.**

No. 64–H–92.

United States District Court
S. D. Texas,
Houston Division.

May 23, 1968.

John K. Meyer, Hinds & Meyer, Houston, Tex., for plaintiff.

William Bullard, Baker, Botts, Sheperd & Coates, Houston, for defendant.

Memorandum and Opinion

SINGLETON, District Judge.

This suit was originally brought by Jefferson Chemical Company, Inc. against the M/T GRENA and her owners, A/S J. Ludwig Mowinckels Rederi, for contamination of glycol cargoes shipped from Port Neches, Texas to Rotterdam, Holland in February and May of 1963. On motion by defendants under Rule 17(a), F.R.Civ.P., this Court ordered Fireman's Fund Insurance Company to be substituted in the place of Jefferson Chemical Company, Inc. as the party plaintiff because it is the real party at interest in this subrogation action.

Mowinckels impleaded Charles Martin Inspectors of Petroleum, Inc. as third party defendant by reason of the plaintiff's assertion that the contamination of the cargoes was due to unseaworthiness of the vessel. At the conclusion of the trial, this Court granted a motion for dismissal of Charles Martin Inspectors of Petroleum, Inc. for the reason that it was undisputed between the parties that the vessel owners had used due diligence to make the vessel seaworthy prior to the commencement of the voyage and the vessel was in fact seaworthy at the commencement of the voyage. Also, a motion to sever the damages issue was granted by the Court.

On April 14, 1961, Jefferson, as charterer, and A/S J. Ludwig Mowinckels Rederi, as vessel owners, entered into a contract entitled a Tanker Voyage Charter Party. It is known as a warshipoilvoy form of charter party. The agreement concerns the shipment of the following products: Ethylene glycol; diethylene glycol; propylene glycol; enthanolamines.

Generally, Jefferson agrees to ship on Mowinckels' ships approximately 10,000 tons a year of the above products. There is a firm agreement as to a freight rate of $8.50 per ton, demurrage of $1,500.00 per day, and lay time of 24 hours per 1,000 tons.

The Charter Party contained a clause reading in part as follows:

"18 General Exceptions Clause. Neither the vessel nor the master nor owners shall be held liable for any loss of or damage or delay to the cargo or for any failure in performing hereunder arising or resulting from: * * unseaworthiness of the vessel whether existing at the beginning of the voyage or developing during the voyage unless caused by want of due diligence on the part of the owner to make the vessel seaworthy or to have her properly manned, equipped, and supplied * * * change in quality of the cargo * * * discoloration; contamination; deterioration; * * * "

The Charter Party did not name a specific vessel but rather pledged "Mowinckels' tonnage" to the charterer on a time demand basis and permitted the charterer to take up the full reach of a vessel, although it was not actually contemplated by the charterer that it would do so during the term of the agreement.

The Charter Party also provided for the issuance of bills of lading by the master in due course pursuant to the Charter Party and subject to the terms and provisions thereof.

The GRENA called at Port Neches, Texas, on February 3, and February 4, 1963, at Jefferson's plant. There, 3149 metric tons of ethylene glycol owned by Jefferson were loaded into tanks center 8, starboard 5, and center 3 of the GRENA. The tanks were first inspected and found to be clean and suitable for loading.

Ethylene glycol is a clear, somewhat viscous liquid. Among its numerous chemical properties are its water content and chloride content which must be kept within specific limits if the product is to remain marketable. Jefferson had published specifications for the grade of ethylene glycol involved which must be met in order for the product to be marketable.

Samples of the ethylene glycol were taken and analyzed both in the shore tanks immediately prior to loading and in the ship's tanks immediately after loading. These showed the product to be within the published specifications and in good condition.

The GRENA departed Port Neches, Texas, called at and loaded more products of other shippers at five other Texas ports, and finally departed the last of those, Corpus Christi, on February 11, 1963.

Immediately upon arrival of the GRENA at Rotterdam, proper sampling and analysis was performed. The ethylene glycol in the center 8 and starboard 5 tanks was found to be in good condition, within the specifications, and marketable. The ethylene glycol in the port 3 tank was found to be outside the specifications. The sampling and analysis were properly performed by experts, laboratorian D. J. W. Kreulen representing Jefferson, and Caleb Brett & Sons, representing Fireman's Fund Insurance Company.

There were 959.013 metric tons of ethylene glycol in tank port 3 which was, upon delivery at Rotterdam, contaminated, damaged, and unmarketable. The reason for this contamination was the entry of approximately 400 gallons of sea water.

A joint survey was held on board the vessel at Rotterdam between surveyors appointed by all interests involved, and after testing of the tank tops, butterworth holes, and other tank openings, the surveyors found the No. 3 port wing tank to be water tight and could not account for the entry of salt water or the increase of chloride in the water. The surveyor for the cargo interests, however, stated that the increase in chloride percentage could have been caused through an intake of salt and water through the tank's air vent line. This Court finds that the tank's air vent lines were not a reasonably probable source of entry of the sea water, and the evidence does not offer any reasonable explanation as to how the salt water entered to contaminate the cargo.

The second claim arose out of a shipment which was picked up at Port Neches, Texas, on May 13, 1963 and delivered to Rotterdam, Holland, June 6, 1963. On this voyage the following cargoes were loaded: 527.16 metric tons of propylene glycol into starboard tank 2; 523 metric tons of diethylene glycol into port tank 2; and 1,569 metric tons of ethylene glycol into center tank 7.

Jefferson had published specifications for grades of propylene glycol which must be met in order for the product to be marketable. Important for our purposes here is the color and the iron content.

Immediately upon arrival of the GRENA at Rotterdam, proper sampling and analysis were performed. The ethylene glycol in the center 7 tank and the diethylene glycol in the port 2 tank were found to be in good condition, within the specifications, and marketable. The propylene glycol in the starboard 2 tank was found to be well outside the specifications and unmarketable.

Both Jefferson and Mowinckels agree that propylene glycol will absorb iron

from unlined mild steel tank walls. Both parties knew that the starboard 2 tank had unlined mild steel construction. Jefferson contends this iron pickup had always stayed within its specifications on prior voyages, and the high increase in iron that occurred on this voyage was due to improper preparation of the tank by Mowinckels. However, there was evidence to show that because of propylene glycol and its inherent nature, it should be shipped in lined or stainless steel tanks to avoid its natural tendency to react with ordinary steel. This Court finds that the tank was clean and dry at the beginning of the voyage; and therefore it was suitable for shipment of the propylene glycol. The increase in iron content was due to the nature of the cargo itself and this was a risk Jefferson exposed itself to by not requiring shipment of this product in lined or stainless steel tanks.

Due to the presence of the exoneration clause in the Tanker Voyage Charter Party, a controlling question has arisen as to the applicability of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq.

Mowinckels asserts that this agreement between the parties is a Charter Party, and, therefore, COGSA does not apply. See 46 U.S.C.A. § 1305. Mowinckels stresses the fact that Jefferson had the option to use the total space on the M/T GRENA for its own purposes even though it was obvious to both parties that this would never be done and that Mowinckels could do as it pleased with the remaining space of the GRENA. On the other hand, Jefferson argues that the agreement between the parties is not a true Charter Party, but merely a contract of affreightment. They assert that the GRENA was actually a common carrier and Jefferson was one of many companies shipping their cargoes on Mowinckels' vessels. Jefferson is saying that this is public carriage as opposed to private carriage; therefore, COGSA should apply and render the exoneration clause a nullity. 46 U.S.C.A. § 1303(8).

■ The application of COGSA does not depend upon the fact of the GRENA being engaged in public or private carriage. As was stated in Healy & Curry, Cases and Materials on Admiralty, 502 (1st ed. 1965), citing as authority Institutio Cubano de Estabilizacion del Azucar v. T/V GOLDEN WEST, 2 Cir., 246 F.2d 802, cert. den. 355 U.S. 884, 78 S. Ct. 152, 2 L.Ed.2d 114:

"It is inaccurate to consider COGSA as statutory regulation of common carriage, as distinguished from private carriage. It is generally considered that if any part of the vessel is available to the public, the owner is a common carrier, even though the other portion may be taken up by cargo ships under a special charter. COGSA applies not only to the carriage of goods under bills of lading on vessels engaged wholly or partly in common carriage, but also to carriage on vessels under voyage charter, from the time the bills of lading issued for the cargoes become the contracts of carriage by negotiation to third parties. COGSA should therefore be considered as statutory regulation of bills of lading and similar documents of title which evidence contracts of carriage by water, whether the carriage be private or common, as distinguished from charter parties and other contracts of affreightment which do not also serve as documents of title."

■ From the above discussion, this Court concludes that the important thing to consider in determining whether COGSA applies or not, in the situation presented here, is the issuance of the bills of lading and what the bills of lading represented between the parties.

Bills of lading covering both of the cargoes in question were issued by the master in due course pursuant to the Charter Party and subject to the terms and provisions thereof, and it was not intended or anticipated by either Jefferson or Mowinckels that the bills of lading would be negotiable or negotiated to any third party. In other words, the bills of lading served no purpose other

than receipts for the cargoes shipped by Jefferson on board the GRENA.

■ Jefferson argues that since bills of lading were issued, this is all that is necessary to make COGSA applicable. With this position, I do not agree. In a number of cases, some of them decided before COGSA, it was held that when the charterer is also the holder of the bill of lading, then the Charter Party is the contract which controls, and the bill of lading is merely a receipt. See Albert E. Reed & Company v. M/S THACKERAY, 232 F.Supp. 748 (N.D. Fla.1964), and cases cited therein. As was stated in United States v. Wessel, Duval & Co., 115 F.Supp. 678 (S.D.N.Y. 1953):

> "A bill of lading is a document which serves both as a receipt and a contract, * * * but where the shipper is also the charterer, the contractual element does not arise until the document is transferred."

Therefore, COGSA applies when this transfer to a third party takes place and the bill of lading represents the actual contract between the parties.

A reading of the definitions section of COGSA, 46 U.S.C.A. § 1301, supports the above conclusion:

> "(b) The term 'contract of carriage' applies only to contracts of carriage covered by a bill of lading or any similar documents of title, insofar as such document relates to the carriage of goods by sea, including any bill of lading or any similar document as aforesaid issued under or pursuant to a charter party *from the moment at which such bill of lading or similar document of title regulates the relations between a carrier and holder of the same.*"

■ One of the main purposes of COGSA was to equalize the apparent lack of bargaining power of the small shipper of goods whose rights were governed by the bill of lading with the vessel owner or charterer. See discussion in Gilmore & Black, The Law of Admiralty, 193, 194 (1957). Jefferson is not the type of party that COGSA was intended to protect. It is a substantial corporation who, with full knowledge, signed a contract of carriage which contained a clause exonerating the other party from liability for the type of contamination that occurred here. Jefferson is not being required to bear the burden for something that it did not openly agree to.

■ This Court finds that the bills of lading issued for the two shipments in question here were nothing more than receipts for the cargoes shipped, and that the Charter Party represented the actual agreement between the parties. I also find that COGSA does not apply to a bill of lading which remains in the hands of the charterer. Therefore, the exoneration clause relieves the M/T GRENA and her owners, A/S J. Ludwig Mowinckels Rederi, of any responsibility for the contamination of the cargoes on these two voyages, and it is ordered, adjudged, and decreed that judgment be entered in favor of Mowinckels and against Jefferson, with costs being taxed against Jefferson.

Counsel for defendants will submit to the Court a form of judgment after first securing the approval of opposing counsel.