**COASTAL STATES TRADING, INC., Plaintiff,**

v.

**ZENITH NAVIGATION S. A. and Sea King Corporation, Defendants.**

**No. 77 Civ. 98 (CBM).**

United States District Court, S. D. New York.

Aug. 18, 1977.

Hill, Rivkins, Carey, Loesberg & O'Brien by Alan S. Loesberg, Caspar F. Ewig, New York City, for plaintiff.

Poles, Tublin, Patestides & Stratakis by Alvin L. Stern, New York City, for defendants.

## MEMORANDUM OPINION

MOTLEY, District Judge.

This is an action brought by Coastal States Trading, Inc. ("Trading"), as consignee of a cargo of some 28,000 tons of fuel oil, against Zenith Navigation S.A. ("Zenith"), the owner of the vessel MT GRAND ZENITH, and Sea King Corporation ("Sea King") which is apparently Zenith's agent in New York.[1] Coastal States seeks to recover the value of the oil, which was aboard the GRAND ZENITH on a voyage from Tees, England to Brayton Point, Massachusetts when the ship vanished virtually without a trace on or after December 31, 1976.

Defendant Zenith seeks an order referring the entire dispute to arbitration pursuant to 9 U.S.C. § 3 or, in the alternative, dismissing the action. Plaintiff has cross-moved seeking an order of attachment of

1. Zenith is clearly the principal defendant in this lawsuit. The allegations of the complaint reflect some uncertainty as to the precise relationship between Sea King and Zenith. For instance, in Paragraph Third of the Second Amended Complaint, Zenith is said to be doing business "through its agent and/or alter ego", Sea King, and in Paragraph Fourth, it is alleged that Sea King "partially owned, controlled, managed, chartered and/or otherwise was the alter ego" of Zenith. In two "alternative" causes of action against Sea King, however, Sea King is alleged to be derelict in its responsibilities as, first, owner of the GRAND ZENITH and, second, not the owner, but the manager and operator of the vessel. In the papers on the instant motion, however, both parties refer to Zenith as the owner of the vessel. Although the same law firm represents both defendants and the instant motions are made on behalf of both defendants, Zenith is clearly the defendant whose interests are principally at stake. Accordingly, in this opinion, the court will refer only to Zenith as the moving party.

certain of Zenith's assets. The motion to dismiss is denied, the motion for an attachment is granted, but the action is ordered stayed and transferred to the Suspense Calendar of the court pending completion of arbitration.

### The Arbitration Question

It is conceded, at the outset, that plaintiff is not a signatory to any arbitration agreement to which Zenith is also a party. However, the issues to be determined are (1) whether Trading is the "alter ego" of a corporation which is bound by the terms of an arbitration agreement with Zenith, such that it should also be bound on the authority of *Fisser v. International Bank*, 282 F.2d 231 (2d Cir. 1960) and its progeny; and (2) whether the bill of lading for the cargo in question—the contract on which plaintiff is suing—can be said to have incorporated a charter party (and arbitration clause). *See Son Shipping Co., Inc. v. De Fosse & Tanghe, et al.*, 199 F.2d 687 (2d Cir. 1952). Resolution of these issues requires discussion of the facts adduced by the parties.[2]

On or about October 30, 1973, Zenith entered into an agreement with Pacific Gas and Electric Company ("Pacific Gas"), a California corporation, whereby Pacific Gas chartered the Grand Zenith for a period of four years. That charter party included an arbitration clause[3] which provided for arbitration in New York, and which forms one basis for Zenith's arbitration demand in this action. This time charter was subsequently assigned in writing to Pacific Refining Company, a Delaware corporation doing business principally in California.

Pacific Refining Company is a wholly-owned subsidiary of CIC Industries Incorporated which, in turn, is a wholly-owned subsidiary of Coastal States Gas Corporation, another Delaware corporation, which is listed on the New York Stock Exchange. Coastal States Gas Corporation is the parent of a number of other subsidiaries, including the plaintiff, Trading, and Coscol Petroleum Corporation ("Coscol") both of which are separately constituted Delaware corporations.

The interrelationship of these various corporate entities is critical to disposition of the arbitration question in this case. Coscol, Trading, and Pacific Refining are unquestionably closely related and interdependent parts of a large energy conglomerate. The deposition testimony adduced to date indicates that Trading, as its name implies, is the brokerage "arm" or "division" of Coastal States Gas Corporation, responsible for buying and selling various kinds of petroleum products. Coscol is the transportation "division", primarily responsible for ship chartering and operating arrangements to serve the other branches of the Coastal States Gas complex. Pacific Refining is the (or perhaps, one of the) production "divisions" of Coastal States Gas Corporation, operating a refinery in Hercules, California.

---

**2.** After discovery by both parties, including several depositions, most of the facts relevant to these motions have been established without substantial dispute. However, the inferences to be drawn from those facts are seriously contested.

**3.** "(c) Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in New York pursuant to the U. S. laws related to arbitration there in force, before a Board of three persons consisting of one (1) arbitrator to be appointed by Owner, one (1) by Charterer, and one (1) by the two so chosen. In the event that either Owner or Charterer shall state a dispute and designate an arbitrator, in writing, the other party shall have twenty (20) days, excluding Saturdays, Sundays and legal holidays to designate his arbitrator failing which the single arbitrator can render an award hereunder. The decision of any two (2) of the three (3) on any point or points shall be final. Until such time as the arbitrators finally close the Hearings, either party shall have the right by written notice served on the arbitrators and on the other party to specify further disputes or differences under this Charter for hearing and determination. The arbitrators may grant any relief, and render an award, which they or a majority of them deem just and equitable and within the scope of the agreement of the parties, including but not limited to, specific performance. Awards pursuant to this Clause may include costs, including a reasonable allowance for attorneys' fees and judgments may be entered upon any award made herein in any court having jurisdiction."

The "divisions" with which this case is principally concerned unquestionably operate in close physical proximity to each other. With the exception of Pacific Refining, all of the previously mentioned corporations, along with other subsidiaries, maintain their principal offices in six stories of a twelve-story building at Five Greenway Plaza East, in Houston, Texas. Coscol, Trading, and Coastal States Gas Corporation all share the same business telephone number, although the local telephone directory contains only a listing for the parent corporation. The telephone calls from one "division" to another are made by dialing an extension, rather than a separate outside number. Persons employed within the Coastal States Gas umbrella commonly refer to the various corporate subsidiaries as "arms", "branches", or "divisions" of one larger concern, the parent company.

However, such superficial indicia of interrelatedness are, of course, not dispositive of the question whether one company is an "alter ego" of another, as they do not give a complete or necessarily accurate picture of the corporate relationships involved. To obtain such a perspective, observation of the practical operation of these companies is more instructive, and the transaction underlying this lawsuit provides a good point of departure.

After the time charter of GRAND ZENITH was assigned to Pacific Refining, it became apparent that that company alone was not going to be able to utilize the ship sufficiently to make a profit. Therefore, around the first of September, 1976, the Chief Executive Officer of Coastal States Gas, Mr. Oscar Wyatt, Jr., instructed the relevant officers of Coscol to take over operation of the GRAND ZENITH and, presumably, to use it as fully and as profitably as possible. No written assignment or any other document was ever executed in effectuating the operational transfer of the GRAND ZENITH from Pacific Refining to Coscol, although, in later voyage subcharters, Coscol was listed as being the "chartered owner". Moreover, Coscol, rather than Pacific Refining, was paying the time charter fee to Zenith from that time forward.

As it does with the other thirty or so ships under its operation, Coscol chartered the GRAND ZENITH both to subsidiaries of Coastal States Gas and also to unrelated corporations. In so doing, Coscol charged its "brother" corporations a freight rate based on current market conditions, just as it would unrelated corporations. This practice is followed even though the rate which Coscol is paying the owners of its chartered vessels may, due to changing market conditions, be substantially higher than the market rate currently prevailing for voyage charters. In the case of the GRAND ZENITH, for instance, Coscol was paying Zenith at a rate equivalent to World Scale [4] 200, while the prevailing market rate in the late fall of 1976 was around World Scale 85.

Apparently, in the fall of 1976, International Phillips Petroleum became involved in negotiations with Trading for the sale of a quantity of fuel oil which would be carried on a number of consecutive voyages from England to New England. Ultimately, Trading was offered the fuel on either a C.I.F. or F.O.B. basis, since Phillips had the opportunity of chartering a vessel for a number of voyages at World Scale 85. If the fuel were to be purchased on an F.O.B. basis, Phillips would make an appropriate reduction in the sale price to reflect Trading's cost of transporting the fuel to New England at World Scale 85.

Jose Iglesias, a Vice President of Trading, approached Clifford Neubauer, a Vice President with whom he dealt at Coscol, and informed him that if he could match the rate of World Scale 85, Trading would enter into an agreement with Coscol for transportation of the fuel oil shipments in

---

4. "World Scale" is a concept used in the shipping industry to reflect the cost per ton of moving petroleum products between any two given ports. The World Scale 100 rate is published in booklet form and owners and charterers thereafter negotiate based upon a percentage of the published rate. For example, World Scale 85 represents 85% of the published rate, whereas World Scale 200 represents twice the published rate.

question. On October 26, 1976, Neubauer, by telex, offered *Phillips* the use of the GRAND ZENITH and set forth the salient terms of the agreement, including the utilization of the "EXXONVOY/69" voyage charter party form. Phillips rejected the offer, however, on the ground that the ship was too old.

Coscol and Trading thereafter entered into their own voyage charter agreement, and the contract between Trading and Phillips was consummated on an F.O.B. basis, with the sale price reduced by the amount of the projected transportation cost at World Scale 85. The charter agreement was unwritten, and based upon the understanding of Mr. Iglesias and Mr. Neubauer. The terms offered by Coscol and accepted by Trading were identical to those which had been previously offered to Phillips by telex.

Significant for purposes of this motion are the terms "charter party form Exxon 69" and "freight rate: WS 85". In all voyage charters arranged by Coscol, the EXXONVOY 1969 form was the standard form of charter party utilized, whether the

subcharterer was another subsidiary of Coastal States Gas[5] or an unrelated corporation, and that form contained an arbitration clause.[6] This transaction between Coscol and Trading was no exception.

In terms of the relationship between Coscol and Trading, this transaction is instructive. It seems clear from the deposition testimony that Trading was under no *obligation* to utilize the ships operated by Coscol if it could obtain more favorable freight rates elsewhere. Conversely, Coscol was under no *obligation* to offer its ships, including the GRAND ZENITH, to Trading at freight rates more advantageous than those currently prevalent in the market. In the case of the GRAND ZENITH, Trading paid to Coscol a rate of World Scale 85, while Coscol was paying Zenith on its own charter at a rate of roughly World Scale 200 and absorbing the loss itself. This disparity in rates is not itself dispositive of the question whether Trading "controlled" Coscol since, as Zenith points out, the reasons for Coscol's absorption of the loss on this voyage charter may be unrelated to the

---

**5.** Although Mr. Westmoreland, the Trading employee who most immediately handled the GRAND ZENITH charter, was unsure as to what charter party underlay the transactions with Coscol, the court is persuaded by the deposition testimony of Mr. Iglesias and Mr. Neubauer that responsible officials of both Trading and Coscol understood that the EXXONVOY 69 form was the basic charter document governing their relations.

**6.** "24. ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service upon any officer of the other, wherever he may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and a brief description of the disputes or differences which such party desires to put to arbitration. If the other party shall not, by notice served upon an officer of the first mov-

ing party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with precisely the same force and effect as if said second arbitrator had been appointed by the other party. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court of maritime jurisdiction in the City above-mentioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precisely the same force and effect as if such arbitrator had been appointed by the two arbitrators. Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this Charter for hearing and determination. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgment may be entered upon any award made hereunder in any Court having jurisdiction in the premises."

extent of Trading's "control" of Coscol.[7] However, the fact that Coscol had to, in a sense, compete for Trading's business by offering competitive freight rates under "normal industry standards"[8] is some indication that the separate corporate existence of the two companies is more than a mere matter of form.

This observation is reinforced somewhat by other evidence concerning the corporate operations of these concerns. Both Coscol and Trading have their own employees, although there is a substantial overlap of both the highest corporate officers and the directors. Both corporations are responsible for making their own profits and function as independent profit centers. Each corporation maintains a separate set of corporate and financial records, although for certain purposes, Coastal States Gas Corporation does prepare a consolidated financial statement.

On the other hand, the mechanics of the financial accounting between Coscol, Trading, and the other subsidiaries resembles that between divisions of a single large corporation. Financial records for Coscol and Trading are prepared and maintained by a single accounting department under the supervision of the Controller of Coastal States Gas Corp. and are stored on a single computer. Although both Coscol and Trading maintain their own bank accounts in different banks, neither cash nor checks actually pass between the two companies in payment of freight charges. Instead, appropriate debits and credits are entered on "inner-company" open accounts of the various companies concerned. However, freight invoices are executed to cover, for example, cargo consigned to Trading and carried on Coscol's vessels.

The facts above-summarized constitute the entire basis upon which Zenith predicates its assertion that Trading is the "alter ego" of Coscol, such that it should be bound to arbitrate its grievance with Zenith. Clearly, Zenith would have a stronger case if it were asserting that Coscol should be required to arbitrate with Zenith; Coscol had, in effect, informally or orally subchartered the GRAND ZENITH from Pacific Refining, which was a party, by assignment, to the charter party originally executed by Zenith and Pacific Gas and Electric. It could, perhaps, more easily be said that, for purposes of enforcement of the arbitration clause, Coscol is the alter ego of Pacific Refining.

However, Zenith seeks to go one step further and asserts that Coscol, Pacific Refining, *and Trading* are all "alter egos" of one another. Under the facts of this case, that is a more difficult proposition to prove.

*Fisser v. International Bank, supra,* clearly established that the statutory requirement[9] of a "written agreement" for arbitration does not import a condition that only *signatories* to such provisions can be bound to their terms. Under appropriate circumstances, a corporation which was not such a signatory may be held bound to arbitrate a dispute in which it is involved. However, the principles utilized to determine whether in such cases, arbitration is appropriate are merely those which are employed in other contractual disputes to ascertain whether, on some theory, it is just to disregard independent corporate existence and hold one corporation responsible for the contractual obligations of another.

*Fisser* and a number of other cases have held that when a parent corporation so dominates and controls the affairs of its corporate subsidiary that the subsidiary cannot be said to have any independent existence or will of its own, then the courts may pierce the corporate veil of the subsidi-

---

7. For instance, there may have been tax reasons for causing Coscol to take the loss on the transaction. Or, from the perspective of the parent, Coastal States Gas, there may have been a desire to avoid the anomaly of having a shipping subsidiary operate profitably in a hard-pressed tanker market, while a brokerage subsidiary does poorly during a period of intense demand for energy products. There is no definitive evidence on this point in the case.

8. Deposition of Clifford E. Neubauer, taken February 8, 1977. Page 50.

9. 9 U.S.C. § 4.

ary and bind the parent to the contractual obligations incurred by the subsidiary effectively at the parent's behest. Or, conversely, a subsidiary may, under some circumstances, be held bound to obligations undertaken by its parent. *Kingston Dry Dock Co. v. Lake Champlain Transportation Co.*, 31 F.2d 265 (2d Cir. 1929); *National Bond Finance Company v. General Motors Corp.*, 238 F.Supp. 248 (W.D.Mo.1964), *aff'd*, 341 F.2d 1022 (8th Cir. 1965); *Chilean Nitrate Sales Corp. v. The Nortuna*, 128 F.Supp. 938 (S.D.N.Y.1955). Such a disregard of the separate corporate trappings of the subsidiary may be appropriate if it is found that the subsidiary was expressly functioning as agent for the parent, as in *The Nortuna*, *supra*, or, in the absence of such an agency relationship, if the subsidiary is merely an "instrumentality" of the parent.

As the *Fisser* case made clear, the courts do not lightly disregard the separate existence of related corporations, even in deference to a strong policy favoring arbitration of private commercial disputes. In *Fisser*, Judge Hincks essentially adopted the reasoning of a New York case which set forth three prerequisites for invocation of the alter ego doctrine as the rationale for disregarding the separate identity of related corporations. A party seeking, as in this case, to bind a corporation to an arbitration agreement to which it is not a signatory must *first* establish that the subsidiary corporation was controlled to such a degree by the parent that it had "no separate mind, will, or existence of its own". *Fisser, supra*, at 238. Such control must go beyond mere stock ownership, or even identity of officers and directors, to the point that the controlling corporation dominates the finances, policy, and business practices of the controlled corporation. *Id.* The "puppeteer" (282 F.2d at 234) must so thoroughly interpose itself into the conduct of the controlled corporation that it can be said that the latter is merely a "screen" for the activities of the former. *Kingston, supra*, at 267.

In the court's view, Zenith has failed to meet its burden of proving by a preponderance of the evidence that Trading exer-

cised such control over Coscol in this case, or, for that matter, that Coscol controlled Trading. Zenith has clearly established that these two corporations, along with their brethren, are closely related corporations, the employees of which conduct their inter-company affairs with the informality that comes from constant association. Zenith has also set forth the conceded links among corporate officers and directors, and the fact that certain accounting facilities are shared among these two corporations and others.

However, Zenith has significantly failed to prove that the dealings between Coscol and Trading are conducted on anything but an arm's length basis, or that the employees of either have failed to observe the formalities incident to doing business in the corporate form. There has been no showing of any over-reaching by Trading into Coscol's affairs, nor has there been any showing that Trading sought, either properly or improperly, to alter or affect the way Coscol carries on its business, either in this or any other transaction. The fact that Coscol's primary *raison d'etre* is provision of shipping services to other subsidiaries of Coastal States Gas Corporation does not necessarily suggest that the corporate separateness of Coscol and Trading should not be observed in these circumstances.

Realistically, of course, the court must focus not only on the relationship between Coscol and Trading but also on the relationship between these subsidiaries and Coastal States Gas, the parent. One would expect that the degree of control necessary to invoke the alter ego doctrine would be exercised by a parent over its subsidiaries, rather than by one subsidiary over another. With the exception of *Amoco Overseas Company v. S. T. Avenger*, 387 F.Supp. 589 (S.D.N.Y.1975), discussed below, all the cases cited to the court dealing with either the alter ego doctrine, *per se*, or disregard of corporate distinctness under some other theory have involved parent and subsidiary corporations. *Fisser, supra; National Bond Finance, supra; Kingston, supra; The Nortuna, supra; United States v. Dean Van*

*Lines, Inc.*, 531 F.2d 289 (5th Cir. 1976). However, in the court's view, Zenith has failed to prove that Coastal States Gas exercises such pervasive, direct, and complete dominion over Coscol and Trading that it would be inequitable for that corporation to insist that parties dealing with its subsidiaries respect their corporate distinctness. It was, of course, shown that, apparently at the direction of Mr. Wyatt, the GRAND ZENITH was informally transferred from the operational control of Pacific Refining to Coscol. However, this fact, even taken together with the other evidence of informal dealings and close association, is not sufficient to establish that the parent so totally dictated the business and financial practices of its subsidiaries, either generally or in the transaction here at issue, that the alter ego doctrine should be applicable.[10] Accordingly, the court holds that Trading is not obligated to arbitrate its grievance with Zenith on account of its relationship with Coscol and/or Coastal States Gas.

Zenith's assertion of Trading's obligation to arbitrate is not based solely upon the alter ego theory, however. It also notes that the bill of lading issued by Zenith to Phillips Imperial Petroleum and signed by the Master of the GRAND ZENITH contained the typed phrase "freight per charter party" and also the printed legend, in bold face type, "All conditions and exceptions of the Charter Party being considered embodied in this Bill of Lading". Thus, Zenith argues, those references clearly indicate that a charter party, with its arbitration clause, was meant to govern the details of that shipment. Moreover, it further argues that Trading is bound to arbitrate its dispute with Zenith, since this bill of lading is the contract on which this suit is predicated. The court agrees.

It is, of course, clear that the terms of a charter party, including an arbitration clause, may, by appropriate reference, be incorporated into a bill of lading. *Son Shipping v. De Fosse & Tanghe, supra.* It is also clear that, in an appropriate case, a holder of such a bill of lading may be bound to arbitrate his disputes arising from the bill of lading, even though he himself may not have been signatory to the underlying charter party which is incorporated. *Lowry & Co., Inc. v. S.S. Nadir*, 223 F.Supp. 871 (S.D.N.Y.1963). However, an incomplete or inaccurate reference to a charter party in a bill of lading may prove insufficient to incorporate the charter party to the bill of lading, *Southwestern Sugar & Molasses Company, Inc. v. The Eliza Jane Nicholson*, 126 F.Supp. 666 (S.D.N.Y.1954), at least when the party sought to be compelled is a stranger to the underlying charter party. *Cf. Amoco Overseas Company v. S. T. Avenger, supra.*

In the instant case, the previously cited reference in the bill of lading make clear that some such incorporation was intended. While the bare language of the document itself might otherwise leave considerable ambiguity as to *which* charter party was meant to be incorporated thereby, *cf. United States v. Cia. Naviera Continental, S.A.*, 202 F.Supp. 698 (S.D.N.Y.1962), the evidence in this case is clear that the charter party to which the bill of lading made reference was the EXXONVOY 69 form of voyage charter between Coscol and Trading, rather than the time charter agreement originally signed by Zenith and Pacific Gas and Electric. Employees of both Coscol and Trading testified that their practice was to make the EXXONVOY 69 form the basis of their voyage charters. They further testi-

10. Since the court finds that Zenith has failed to prove a sufficient degree of corporate control to render applicable the alter ego doctrine, it need not discuss whether Zenith has made a necessary showing of the other elements to invoke that instrumentality rule. Specifically, it need not discuss whether Zenith has established that "[s]uch control [has] been used by [Coastal States Gas or its subsidiaries] to commit fraud or worse, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of [Zenith's] legal rights", and whether that control and breach of duty have proximately caused injury or unjust loss to Zenith. *Fisser, supra*, at 238, *quoting Lowendahl v. Baltimore & Ohio R.R. Co.*, 247 App.Div. 144, 287 N.Y.S. 62 (App.Div. 1st Dept.) *aff'd*, 272 N.Y. 360, 6 N.E.2d 56 (1936).

fied, without contradiction, that the reference to the charter party in the bill of lading was meant to refer to the voyage charter, rather than the time charter with Zenith. This interpretation of the reference in the bill of lading is corroborated by the fact that the freight rate between Coscol and Trading was World Scale 85, the roughly prevailing market rate, rather than World Scale 200, the rate equivalent to that provided for in the time charter with Zenith.

Since this evidence concerning the charter party to which the bill of lading makes reference comes, in considerable measure, from Trading's own employees, Trading is hardly in a position to claim surprise or unfair advantage in a holding that the bill of lading incorporates the terms of the EXXONVOY 69 voyage charter party. However, Trading argues that, since the voyage charter is a contract between itself and Coscol and since the *time* charter to which Zenith is a party is not incorporated in the bill of lading, it is under no obligation to arbitrate its dispute with Zenith, with whom it has no "charter relationship". The court does not find this argument persuasive.

■ The bill of lading, by its terms, merely adopts the provisions of the EXXONVOY 69 charter party and makes them part and parcel of that document—a contract between Trading, as consignee, and Zenith, a ship owner. The fact that the provisions adopted in the bill of lading were terms of another *contract*, rather than standard provisions in a form book or the terms of legislation or international agreements, does not in any way detract from their legal significance as integral parts of the contract which is the bill of lading. As such, they are binding upon the persons seeking to assert rights under that contract. And, since Trading is suing on the bill of lading, it is obliged to arbitrate its dispute with Zenith, a party to the bill of lading contract of carriage. "Where terms of the charter party are . . . expressly incorporated into the bills of lading they are a part of

the contract of carriage and are binding upon those making claim for damages for the breach of that contract just as they would be if the dispute were between the [parties to the charter agreement]." *Son Shipping, supra,* at 688. The fact that Zenith was not a signatory to the EXXONVOY 69 charter party which it seeks to invoke is simply not pertinent. Moreover, if a non-signatory holder of a bill of lading can compel a signatory to a charter party to arbitrate, *see Import Export Steel Corp. v. Mississippi Valley Barge Line Company,* 351 F.2d 503, 506 (2d Cir. 1965), the court can perceive no difference in the instant situation where it is the non-signatory ship owner who seeks to compel the (signatory) holder of the bill of lading to arbitrate.

■ It is worthy of note that the arbitration clause of the voyage charter [11] by its terms pertains to "[a]ny and all differences and disputes of whatsoever nature arising out of this Charter". This language, unlike that of the clause construed in *Import Export Steel, supra,* at 505–6, is clearly broad enough to encompass the instant dispute between consignee and ship owner.

In sum, the court holds that, by virtue of the incorporation of the EXXONVOY 69 arbitration clause into the bill of lading, Trading is obligated to arbitrate the instant dispute with Zenith, and the action against Zenith will be stayed pending the outcome of the arbitration. Since Sea King has agreed to participate in and be bound by any arbitration directed in this case, accepting any arbitrator appointed by Zenith as its own, the court will also stay the action against Sea King. *See Sam Reisfeld & Son Import Company v. S. A. Eteco, et al.,* 530 F.2d 679, 681 (5th Cir. 1976).

While this result is, in the court's view, correct, the court will also consider Zenith's alternative motion to dismiss the complaint (rather than refer it to arbitration) in the event that a possible appeal of the decision on the arbitration question might find that this case is not properly relegated to the arbitration forum.

---

11. See note 6, *supra.*

*Defendants' Motion to Dismiss*

Zenith has moved in the alternative for an order dismissing the case on the ground that the complaint fails to state a cause of action. It argues that if Trading is not found to be the alter ego of Coscol, there is no privity of contract between Trading and Zenith, and therefore Zenith could not possibly be liable *in personam* to Trading. Briefly stated, its argument is that since Trading is not only the holder of the bill of lading signed by the Master of the GRAND ZENITH, but is also the charterer on the voyage in question, the bill of lading must be treated merely as a receipt, with the charter party constituting the entire contract of carriage for the ill-fated voyage. Thus, the argument runs, the Master's signature on the bill of lading which is not challenged by Zenith, is insufficient to establish any contractual relationship between Trading and Zenith on which to base this lawsuit. The court does not find this argument persuasive.

In the first place, a number of cases on which Zenith relies for the proposition that it is not liable *in personam* are cases in which no one with authority to bind the vessel owner has signed the bill of lading. *Associated Metals & Minerals Corporation v. S. S. Portoria,* 484 F.2d 460, 462 (5th Cir. 1973); *Demsey & Associates v. S. S. Sea Star,* 461 F.2d 1009, 1015 (2d Cir. 1972); *International Selling Corporation v. Aiden Shipping Company Ltd.,* 1972 A.M.C. 669, 672 (S.D.N.Y.1972); *Tube Products of India v. S. S. Rio Grande,* 334 F.Supp. 1039, 1041 (S.D.N.Y.1971); *United Nations Childrens Fund v. S. S. Nordstern,* 251 F.Supp. 833, 838 (S.D.N.Y.1965). That is not the case here.

■ More significantly, however, the court has already determined that Trading has no charter relationship with Zenith [12], and that the reference to a charter party in the bill of lading pertained to the voyage charter between Trading and Coscol. There is, of course, a body of law which holds that a bill of lading in the hands of a charterer who is also the consignee functions merely as a receipt, rather than a contract. *See Jefferson Chemical Company v. M/T Grena,* 292 F.Supp. 500, 504 (S.D. Tex.1968) (and cases cited therein), *modified,* 413 F.2d 864 (5th Cir. 1969); *Scrutton on Charter-parties and Bills of Lading,* Sec. VI (18th Ed.1974). That doctrine is a rule of construction, *Scrutton, supra,* at pp. 56–7, necessitated by what would otherwise be the coexistence of, and possible disparity between, two contracts between the same parties governing the same voyage. However, where, as here, the voyage charter governs the relationship between Trading and Coscol, and the bill of lading governs the relationship between Trading and Zenith, that rule of construction would seem to have no place. Accordingly, the bill of lading should be treated as a contract between Trading and Zenith, upon which the former may sue. And, since Zenith has not formally raised any issue as to the authority and propriety of the Master's signature upon the bill of lading, the general rule holding the vessel owner liable *in personam* on the basis of the Master's signature applies, irrespective of whether Pacific Refining (or, arguably, Coscol) was the time charterer of the vessel. *Nichimen Company, Inc. v. M. V. Farland,* 462 F.2d 319, 330 (2d Cir. 1972); *see also Field Line (Cardiff) Ltd. v. South Atlantic Steamship Line,* 201 F. 301, 304 (5th Cir. 1912). The motion to dismiss is, accordingly, denied.

*Motion for Attachment*

The next issue for decision is whether plaintiff is entitled to an attachment of Zenith's assets within the jurisdiction, including the proceeds on policies of hull insurance. Zenith is a one-ship Panamanian corporation, which does business in the State of New York and has an office and

---

**12.** Although Zenith and Trading are both parties to a contract, *i. e.,* the bill of lading, which incorporates terms of a charter party, they are not both signatories to the *same* charter party. Moreover, as indicated *supra,* Trading is not the alter ego of either Coscol or Pacific Refining, which are both, arguably, parties to the time charter with Zenith (Pacific Refining by written assignment, and Coscol by oral assignment from Refining).

place of business in care of Sea King Corporation, 32 Broadway, New York City. Plaintiff urges that such an attachment is appropriate under Rule 64, F.R.Civ.P., and N.Y.C.P.L.R. § 6201(1), which provides for attachment when the defendant is a foreign corporation.

Zenith objects to the grant of an attachment, however, basing its argument principally upon this court's previous decision in the case of *Metropolitan World Tanker Corp. v. P. N. Pertambangan Minjakdangas Bumi Nasional (P. M. Pertamina)*, 427 F.Supp. 2 (S.D.N.Y.1975), and upon the decision of the Court of Appeals for the Third Circuit in *McCreary Tire & Rubber Company v. Ceat*, 501 F.2d 1032 (3d Cir. 1974). Simply stated, Zenith's argument is that because this is a dispute properly referable to arbitration, the provisional remedy of attachment is not available to a plaintiff which, by hypothesis, is suing in violation of its prior agreement to arbitrate its disputes. The court does not find the citations apposite or the argument persuasive.

In both the *Pertamina* and *McCreary* cases, the relationships among the parties were governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201 *et seq.*; in the *Pertamina* case, none of the parties were United States citizens, and in the *McCreary* case, the defendant CEAT was an Italian corporation. The instant case, however, appears to fall within the exception to the Convention's applicability provided in 9 U.S.C. § 202, in that this action arises out of a contract, *i. e.*, bill of lading, "entirely between citizens of the United States". Trading is clearly an American corporation and, while Zenith is a Panamanian corporation, it appears from the evidence in the case thus far adduced that it has its principal place of business in New York City, thereby making it a "citizen of the United States" for purposes of that section, and removing the contract

from the terms of the Convention. The significance of this distinction stems from the Third Circuit's interpretation of the Convention as absolutely precluding the application of state provisional remedies in a dispute to which an arbitration clause was applicable. 501 F.2d at 1038. Both the Third Circuit and this court in the *Pertamina* case noted that the Convention made no provision for prearbitration attachment.

In so holding, the *McCreary* court distinguished the language of the Convention from that of Section 3 of the Arbitration Act, 9 U.S.C. § 3, which has been interpreted by the Supreme Court as *allowing* commencement of an action by attachment, if such procedure is otherwise available under applicable law. *Barge "Anaconda" v. American Sugar Refining Company*, 322 U.S. 42, 44, 64 S.Ct. 863, 88 L.Ed. 1117 (1944). Moreover, Judge Learned Hand has ruled in this Circuit that the existence of an arbitration clause in a contract does not necessarily deprive the plaintiff of provisional remedies, such as prearbitration attachment in a suit covered by Section 3. *Murray Oil Products Co., Inc. v. Mitsui & Co., Ltd.*, 146 F.2d 381 (2d Cir. 1944).[13]

Thus, unlike the *Pertamina* and *McCreary* cases, this case involves a plaintiff which is not bound by the strictures of the Convention and which is therefore not automatically barred from seeking an attachment prior to arbitration a remedy available under the *Anaconda* and *Murray Oil* cases. Furthermore, whatever doubt may here exist concerning the propriety of an attachment under Section 8 of the Act (by virtue of the fact that plaintiff invokes the court's jurisdiction under Rule 9(h), F.R. Civ.P.), *see Pertamina, supra,* this court also has diversity jurisdiction in this case, 28 U.S.C. § 1332, unlike the *Pertamina* case (where all parties were foreign citizens), and prearbitration attachment is available in such cases. *Murray Oil, supra.* The only remaining question is whether such an attachment is appropriate in this case under

---

**13.** This court would not join with the Third Circuit's interpretation (501 F.2d at 1038) of the Supreme Court's decision in *Bernhardt v. Polygraphic Company of America, Inc.*, 350

U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956) as necessarily invalidating Judge Hand's conclusion that prearbitration attachment is available to a plaintiff under 9 U.S.C. § 3.

**342**

the above-cited Rules. The court feels that it is.

■ Despite the fact that, for purposes of determining the applicability of the Convention, Zenith is a "citizen of the United States", it nonetheless appears that it is a "foreign corporation" within the intendment of the attachment statute. It is, of course, incorporated in Panama. The fact that it does business in this state does not render the statute inapplicable. *A. C. Israel Commodity Co. v. Banco do Brasil,* 50 Misc.2d 362, 270 N.Y.S.2d 283, 290 (Sup.Ct. N.Y.Cty.1966). Nor, in this case, does the fact that it maintains, in effect, its principal place of business in New York render it a domestic corporation such that attachment under C.P.L.R. § 6201(1) is inappropriate. Indeed, the rationale for the foreign attachment provision seems directly applicable here. The only substantial asset of this corporation was the GRAND ZENITH, which is no longer a viable source of security for creditors. For all that appears, the corporation has no reason to continue its operations in New York and every reason to disperse the proceeds of its hull insurance in satisfaction of claims here and abroad. Thus, the plaintiff here has a clear need to temporarily hold the corporation's assets in the jurisdiction to ensure satisfaction of an arbitral award, it any.

■ Although Trading is a Delaware corporation, it may maintain an action against Zenith in the New York courts. N.Y.Business Corporation Law § 1314(b)(5). Trading has made out a prima facie case, as required under New York law, *Aerotrade, Inc. v. Banque Nationale de la Republique D'Haiti,* 376 F.Supp. 1286, 1287 (S.D.N.Y. 1974), by the presentation of a clean bill of lading, signed by the Master of the GRAND ZENITH, and the obvious inability of Zenith to make delivery at the port of discharge. *Demsey & Associates, supra,* at 1014.

Accordingly, an order of attachment will issue.

---

**14.** Compare, *e. g., Bigge Crane and Rigging Co. v. Docutel Corporation,* 371 F.Supp. 240 (E.D. N.Y.1973) (discovery proper) with *Commercial*

*Discovery*

Although the cases are divided as to the propriety of allowing discovery in a suit which is stayed pending the outcome of an arbitration proceeding,[14] this court is of the view that plaintiff has set forth no such compelling circumstances in support of its request for continued discovery as would outweigh the parties' evident interest in avoiding, through arbitration, the expense and time entailed in making and complying with often cumbersome discovery requests under the Federal Rules of Civil Procedure. Accordingly, plaintiff's request for further discovery is denied at this time. In view of the concededly difficult task facing plaintiff in reconstructing the causes of the disappearance of the GRAND ZENITH under these circumstances, however, the court will be willing to entertain a further application if plaintiff is not able to obtain sufficient discovery, on a voluntary basis, to adequately substantiate its claims.

Submit order on notice.

---

*Solvents Corp. v. Louisiana Liquid Fertilizer Company, Inc.,* 20 F.R.D. 359 (S.D.N.Y.1957) (discovery improper).