Harold R. FARROW

v.

Robert V. CAHILL and Joel R. Kaswell, Appellants.

No. 79–1817.

United States Court of Appeals, District of Columbia Circuit.

Argued 29 April 1980.

Decided 12 Dec. 1980.

Kate A. Martin, Washington, D. C., with whom Michael Nussbaum and Lucien Hilmer, Washington, D. C., were on the brief, for appellants.

Jay L. Cohen, Washington, D. C., with whom Fred Israel, Washington, D. C., was on the brief, for appellee.

Before WILKEY, WALD and EDWARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

The appellants, two Washington lawyers, ask us to reverse the district court's decision to enforce a written agreement they reached with an Oakland, California, law firm, their former employer, to buy that firm's Washington branch office. Their most meritorious contention is that the District of Columbia Statute of Frauds bars enforcement of the agreement. We disagree and affirm.

## I. SUMMARY OF THE FACTS FOUND BY THE TRIAL COURT

After a bench trial, District Judge Harold Greene found the following:[1] In 1971 appellants Cahill and Kaswell joined an Oakland, California, law firm owned by appellee Farrow for the purpose of opening a Washington, D. C., branch office. Cahill and Kaswell joined the firm, not as partners,[2] but as employees who were paid a share of the net profits of the firm. They then opened and operated a Washington branch office, but over time, as sometimes happens when a branch office is located far from the home office, friction developed between the Washington and Oakland offices. Finally, in 1974 Cahill and Kaswell

---

1. Findings of Fact & Conclusions of Law, *Farrow v. Cahill*, No. 76–1599 (D.D.C. 30 Apr. 1979), *reprinted in* Joint Appendix (J.A.) at 19.

2. The question whether Cahill and Kaswell were partners with Farrow was contested at trial. Farrow claimed that he was the proprietor of the firm and that Kaswell and Cahill were entitled only to a share of the net profits as compensation for their services. Kaswell and Cahill, on the other hand, contended that they were full partners, owning a percentage of the firm. The trial court concluded that Farrow's understanding of the operation of the firm was correct. Among the evidence presented at trial was a letter dated 21 August 1971 from Farrow to Kaswell confirming their "basic understanding" that "the new association will not be a full proprietary partnership. The business, as such, will continue to be owned by me . . . ." Two other members of the firm, Dent and Schildhause, who joined the firm in 1974, confirmed that Farrow owned the firm. In addition Kaswell and Cahill wrote separate but identical letters to Farrow on 5 August 1974 in which they confirmed that Farrow's letter of 20 August 1971 "expresses my understanding in most respects of the arrangement between us at October 1, 1971, the date that I agreed to serve as a member of the firm." Nonetheless, Cahill and Kaswell argued at trial that they had never negotiated the basis of their association with Farrow but had always assumed that they were in full partnership. Judge Greene found this suggestion to be "simply incredible." Findings of Fact & Conclusions of Law at 2–3, *Farrow v. Cahill*, No. 76–1599 (D.D.C. 30 Apr. 1979), *reprinted in* J.A. at 20–21. Judge Greene concluded that "Farrow owned the firm" and "did not owe to the defendants the fiduciary duty of a partner." *Id.* at 7, *reprinted in* J.A. at 25.

decided it was time to break away from Farrow, to form their own partnership, and to strike out on their own in Washington. To this end they flew to Oakland in November 1974 to negotiate the terms of the break and to buy the Washington practice from Farrow. In Oakland, after a meeting at which Kaswell, Cahill, Farrow and another member of the Oakland office, Dent, were in attendance, an arrangement was worked out and a handwritten "Memorandum Agreement" drawn up. This agreement,[3] which contained a clause specifying that its effectiveness depended on the "consent of all present members of the firm," was not executed before Cahill had to leave the

3. Plaintiff's Exhibit C, *Farrow v. Cahill*, No. 76–1599 (D.D.C. 30 Apr. 1979), *reprinted in* J.A. at 28–30. The complete text of the handwritten draft of the agreement is as follows:

The interest of the partners in the firm of FCK&S will be defined as of November 22, 1974 as follows:

1) Cahill and Kaswell will hereafter operate as a separate fiscal entity under the name of Cahill & Kaswell according to the following provisions

2) Cahill & Kaswell will assume and hold harmless all other members of the firm and the firm from the following category of liabilities:

1) Office lease rental payments & parking

2) Business equipment & supplies & furniture

3) All credit cards and charge accounts in the names of C&K or held by C or K in the firm name

4) Balance of expense items due if any relating to former employment of Brown

5) Secretariesl [sic], employee and associates [sic] salaries for persons employed by C&K

6) Riggs National Bank loan outstanding

7) Automobile lease payments for C&K

8) Employee witholding [sic] taxes from date hereof

9) Health insurance payments from Dec. 1, 1973

10) One-half of outstanding amounts due Schildhause for firm expenses advanced by him

11) C&K's portion of malpractice insurance from next premium date plus any increase in premiums resulting from this reorganization

13) [sic] Liabilities to suppliers and decorators

4) The members of the firm assign all right title & interest to all office equipment, furnishings, books, business assets, accounts receivable from clients currently or in the past serviced by C&K, except such furnishings and equipment as required by Schildhause and his secretary.

5) C&K release and waive any and all claims to draws, shares or profits or equity interests in the firm accounts and assets except as established by this agreement.

6) The other members of the firm & the firm reserve & C&K grant a first lien to be perfected by appropriate recording in all as-sets assigned hereunder to secure payment of all liabilities assumed by C&K hereunder.

7) The firm & other members of the firm will indemnify & hold harmless C&K from all claims & liabilities of the firm not expressly assumed hereunder, including any obligations or liabilities to Segura, which Farrow personally assumes.

8) Farrow will guarantee the consent of Kaitz to this agreement

9) In consideration of this agreement C&K will pay as and when received an amount equal to the following percentages of all gross receipts of C&K derived from their practice of law and activities related thereto

a) 10% of all receipts not in excess of $300,000 per calendar year

b) 20% of all receipts in excess of 300,000 calendar years [sic]

10) This agreement shall remain in effect until December 31, [1980 or 1990. The year handwritten here was disputed by the parties.]

11) The other members of the firm will pay to C&K rental equal to per sq. ft. cost of Schildhause office and Schildhause will have free use of and access to all office common areas

The other members of the firm will pay to C&K 20% of all gross receipts derived from work referred to the firm by C&K and accepted by the firm

Each party shall have free access to books and records of other party for examination at reasonable times

All parties will do their best to enhance the business activities of each other parties [sic] subject to the applicable rules of professional conduct and canons of ethics.

This agreement will become effective upon the consent of all present members of the firm.

Announcements of this Agreement will be agreed upon in advance by all parties.

Dated: November 22, 1974

Signed: Joel R. Kaswell

Larry B. Dent

O.K. H.R. Farrow

This memorandum is planned to be superceded [sic] by a formal document but if not is binding in respects

Signed: H.R. Farrow

meeting to return to Washington. As a result, only Kaswell, Farrow and Dent signed it. The agreement provided that Cahill and Kaswell would take over the Washington practice, assume the assets and liabilities of the Washington office, and operate it as a separate entity; in return they would pay Farrow a percentage of their gross receipts.

Cahill never did get around to signing the document, although, as Judge Greene found, he consented to it by acting "in all respects as if the agreement were in effect"[4] by, for example, accepting the benefit of the Washington assets, billing Farrow for charges for which Farrow was responsible under the agreement, permitting another member of the Oakland firm, Schildhause, to retain certain furnishings and equipment that, under the agreement, were not to be transferred to the new Washington partnership, and even making an initial payment to Farrow as required by the agreement.[5]

Soon, however, the payments due Farrow stopped coming. Farrow then brought this action in the United States District Court for the District of Columbia to enforce the agreement, or alternatively, to obtain compensation for the conversion of his interest in the Washington practice. Cahill and Kaswell counterclaimed on the theory that they had been partners in Farrow's firm, not his employees, and that Farrow had breached his fiduciary duty to them as the partnership's principal administrator. They sought an accounting of receipts and expenses of the firm from 1971 through 1974.

After trial, Judge Greene dismissed the counterclaim,[6] finding that "since Farrow owned the firm he did not owe to the defendants the fiduciary duty of a partner,"[7] and moreover that, in any event, the "defendants [had] failed to meet their burden of establishing injury due to Farrow's handling of the firm during the four years they were associated."[8] Judge Greene decided the contract claim in Farrow's favor,[9] holding that Cahill had consented to the agreement by his subsequent conduct despite his failure to sign it and that enforcement of the agreement was not barred by the Statute of Frauds. Judge Greene then went on to rule in the alternative that even if the contract had been unenforceable the result of the case would be unchanged because Cahill and Kaswell, by assuming exclusive operation of the Washington office, would then have converted Farrow's property interest in it. By an order dated 30 April 1979[10] Farrow was awarded $44,380 in damages, and by a further order dated 4 June 1979,[11] an additional $6,766.32 in interest to cover the period between November 1974 and the date of judgment. Farrow was also awarded any interest at 6% per year accruing between the date of judgment and payment.

Cahill and Kaswell now appeal to this court. They reiterate their affirmative claim to an accounting, based on their assertion that Farrow owed them the fiduciary duties due partners.[12] In defense against Farrow's claims, they argue that an accounting should be ordered to determine

4. Findings of Fact & Conclusions of Law at 4, *Farrow v. Cahill*, No. 76–1599 (D.D.C. 30 Apr. 1979), *reprinted in* J.A. at 22.

5. *Id.* at 4 n.2, *reprinted in* J.A. at 22 n.2.

6. *Farrow v. Cahill*, No. 76–1599 (D.D.C. 30 Apr. 1979) (order dismissing defendants' counterclaim and entering judgment in favor of the plaintiff).

7. Findings of Fact & Conclusions of Law at 7, *Farrow v. Cahill*, No. 76–1599 (D.D.C. 30 Apr. 1979), *reprinted in* J.A. at 25.

8. *Id.*

9. *Farrow v. Cahill*, No. 76–1599 (D.D.C. 30 Apr. 1979) (order dismissing defendants' counterclaim and entering judgment in favor of the plaintiff).

10. *Id.*

11. *Farrow v. Cahill*, No. 76–1599 (D.D.C. 4 June 1979) (order ruling favorably on plaintiff's motion for an amendment of findings and judgment to award plaintiff interest from the time the debt was due until the date it is paid).

12. Brief for Appellants at 6–10 (citing *inter alia* the Uniform Partnership Act, in force in both the District of Columbia and California).

whether their agreement with Farrow should be set aside because his conduct did not comport with the high standards imposed on partners.[13] In addition, they argue for the first time on appeal that because Farrow failed to show at trial that the other members of the Oakland office consented in 1974 to the terms of the "Memorandum Agreement" as required by the clause requiring the consent of "all present members of the firm," he failed to establish that it had ever become effective.[14] They further argue both (1) that even if Farrow had proven that the agreement had become effective it could not be enforced because of the bar presented by the Statute of Frauds;[15] and (2) that if the agreement could not be enforced, Farrow failed not only to make out a prima facie case of conversion but also to prove tort damages, so the trial court's alternative finding that damages could be awarded for conversion was also erroneous.[16]

## II. THE APPELLANTS' CONTENTIONS NOT BASED ON THE STATUTE OF FRAUDS

Of the arguments put before us by the appellants, only the claim that the Statute of Frauds bars enforcement of the "Memorandum Agreement" is worthy of extended consideration here. Therefore as a preliminary matter we first dispose of the others, either because they plainly lack merit or because we need not reach them in view of our decision on the Statute of Frauds issue.

■ First, the appellants claim they were entitled to the special fiduciary obligations due partners, and that as a result the trial court erred both in dismissing their counterclaim for an accounting and in rejecting their defense that the "Memorandum Agreement" should be set aside because Farrow's conduct could not withstand scrutiny under the rules governing dealings between partners. But neither in their briefs nor at oral argument did the appellants seriously contend that their interest in the firm extended beyond their right to a share of the firm's net profits. The appellants thus have provided no basis either as a matter of fact or of law for overturning Judge Greene's finding that, while they were compensated for their services with a share of the firm's earnings, they were not partners but merely employees. The arguments put forth on appeal by the appellants appear to be based on the novel idea that their rights as employees to receive a share of the firm's profits entitled them to the protections afforded partners. There is no support in the law for this notion,[17] nor, in fact, do the appellants cite authority to support this position.[18] We therefore affirm the trial judge's dismissal of the appellant's counterclaim and his rejection of their suggestion that their settlement with

13. *Id.* at 12–15.

14. *Id.* at 10–12.

15. *Id.* at 15–17.

16. *Id.* at 18–21.

17. Profit sharing by itself does not establish partnership or the rights to which partners are entitled. In fact, the Uniform Partnership Act, in effect in both the District of Columbia and California, specifically excludes profit sharing "as wages of an employee" as even "prima facie evidence" of partnership. Uniform Partnership Act § 7(4)(b); *see, e. g., Allen Chase & Co. v. White Weld & Co.,* 311 F.Supp. 1253, 1259 (S.D.N.Y.1970) ("A person who has no proprietary interest in the business save to share profits as a compensation for services is not a partner or a joint venturer."). It should be noted that the relation between parties associated in business generally cannot be both partnership and employer-employee. J. Crane & A. Bromberg, Law of Partnership 86 n.99 (1968). This fact has been sufficiently obvious that "[t]he courts have usually assumed the either-or principle without discussion." *Id.* at 79.

18. In their brief, the appellants chastise the trial court for holding that Farrow did not owe Cahill and Kaswell the fiduciary duties of a partner simply because Cahill and Kaswell were entitled to share in the firm's profits: "This ruling unsupported by authority, is erroneous." Brief for Appellants at 6. The appellants then failed to provide authority themselves, citing only *Day v. Avery,* 548 F.2d 1018 (D.C. Cir. 1976), *cert. denied,* 431 U.S. 908, 97 S.Ct. 1706, 52 L.Ed.2d 394 (1977), a case in which the partnership relationship was undisputed.

Farrow be examined under the standards appropriate for scrutiny of a contract among partners.

Second, the appellants argue that Farrow failed to prove that the "Memorandum Agreement" ever became effective. They base their argument on the clause of the agreement indicating that it would "become effective upon the consent of all present members of the firm." [19] The appellants argue that Farrow offered no direct evidence of who was a member of the firm on 22 November 1974, the date the agreement was drafted, so that he could not have borne his burden of demonstrating that each of the members consented, especially in view of the fact that the firm's stationery [20] as of 5 September 1974 indicated that the firm was composed of seven members: Farrow, Dent, Zimmerman, Cahill, Kaswell, Schildhause, and Brown. The appellants point out that although Farrow, Kaswell, and Dent signed the memorandum and Cahill consented by conduct, while Schildhause testified that he gave his consent by telephone, no evidence was admitted at trial that either Zimmerman or Kaitz had ever consented to the agreement.[21] Thus, argue the appellants, the trial court erred in holding that the "Memorandum Agreement" was an effective, binding contract.

We need not even consider this contention, however, for whatever merit there might be in this argument, if any, the appellants now raise it for the first time on appeal; they did not put this issue before the trial court. As we have said, "a claimant ordinarily cannot expect to lose in the trial court on one theory but win on appeal under another." [22]

Finally, we also need not reach the appellants' arguments concerning the trial court's alternative holding in favor of Farrow's conversion claims because we conclude that Judge Greene correctly ruled that the "Memorandum Agreement" was a valid, enforceable contract. Thus, it is unnecessary for us to consider whether Farrow also made out a case sounding in tort, or whether the court's award of damages could be justified on a tort, as well as a contract, theory.

## III. THE STATUTE OF FRAUDS QUESTION

The most meritorious claim the appellants put before us is that enforcement of their agreement with Farrow is barred by the District of Columbia Statute of Frauds. The material portions of the Statute provide that:

> An action may not be brought ... upon an agreement that is not to be performed within one year from the making thereof, unless the agreement upon which the action is brought, or a memorandum or note thereof, is in writing ... and signed by the party to be charged therewith or a person authorized by him.[23]

The trial court found that the "Memorandum Agreement" was outside of the Statute for two reasons: first, because Farrow, the plaintiff, fully performed his side of the bargain; and second, because the contract was capable of performance within one year.[24]

The appellants argue that the Statute bars enforcement against Cahill, who did not sign the "Memorandum Agreement." [25] They contend Farrow's obligations under the agreement could not be performed

**19.** See note 3 supra.

**20.** Plaintiffs' Exhibit P, Farrow v. Cahill, No. 76–1599 (D.D.C. 30 Apr. 1979).

**21.** Brief for Appellants at 11. Kaitz was mentioned at paragraph eight of the agreement. See note 3 supra.

**22.** Browzin v. Catholic University of America, 527 F.2d 843, 850 n.15 (D.C. Cir. 1975) (citation omitted).

**23.** Statute of Frauds, D.C.Code Ann. § 28–3502 (1973 & Supps. 1978 & 1980).

**24.** Findings of Fact & Conclusions of Law at 5, Farrow v. Cahill, No. 76–1599 (D.D.C. 30 Apr. 1979), reprinted in J.A. at 23.

**25.** Brief for Appellants at 15–17.

within one year because one of his promises was to "indemnify and hold harmless [Cahill and Kaswell] from all claims & liabilities of the firm not expressly assumed hereunder." [26] Claims against the firm might arise, the appellants point out, well after the passage of one year's time. Furthermore, the appellants argue that Farrow in fact did not fully perform his part of the agreement; they assert that mere part performance by a plaintiff is insufficient to take an agreement outside of the bar of the Statute.

Before analyzing this question, it is well to keep in mind what is *not* at issue here. The appellants do *not* contend on appeal they did not consent to the agreement between them and Farrow. Nor, apart from the Statute of Frauds question, do the appellants contend that the "Memorandum Agreement" did not become an effective contract because Cahill consented by his conduct and another member of the firm

consented orally [27] rather than by signing the document. They do not argue that the clause of the agreement stating that it would "become effective upon the consent of all present members of the firm" should be read to mean that the *written* consent of each member of the firm was required. It is thus not disputed on this appeal that the "Memorandum Agreement" would be a valid oral contract. At issue here is solely whether enforcement of that contract is barred by the Statute of Frauds.

We find that it is not. We do not base our conclusion, as the trial court did,[28] on a finding that the agreement was outside the Statute or was later taken outside the Statute. Instead, we hold that even if the Statute does apply, the "Memorandum Agreement" satisfies it. We therefore do not decide the questions whether the contract was not within the Statute because it was susceptible of performance within a year [29] or whether the contract was taken

**26.** *See* note 3 *supra.*

**27.** Schildhause consented by telephone. Trial Transcript at 160.

**28.** Findings of Fact & Conclusions of Law at 4–5, *Farrow v. Cahill,* No. 76–1599 (D.D.C. 30 Apr. 1979), *reprinted in* J.A. at 22–23.

**29.** The trial court relied on *Snyder v. Hillegeist,* 246 F.2d 649 (D.C.Cir. 1957), to support the proposition that a contract for which performance within a year is at least possible is outside of the Statute of Frauds. *Snyder* involved an oral agreement between the parties to be co-brokers in the acquisition of a building site for a client. Although a site was not acquired for more than a year, the court found that since a site might have been found within a year, the agreement was outside the Statute of Frauds. The appellee supports the trial court by citing *Cary v. U. S. Hoffman Mach. Corp.,* 148 F.Supp. 748, 751 (D.D.C. 1957), a case involving an agreement to pay a monthly sum for life. The appellee argues, Brief for Appellee at 22, that an agreement impliedly conditioned on the continued existence of a partnership is susceptible of performance within one year because the partnership might come to an end in less than one year, just as an agreement to pay a monthly sum for life might be performed in less than one year should the recipient die. The appellee directs us to section 495 of the well-known treatise by Williston to support the proposition that such contracts do not violate the Statute of Frauds. Brief for Appellee at 22

(citing Williston on Contracts § 495, at 582–83 (3d ed. W. Jaeger 1960 & Supp.1980)).

As the Williston treatise points out, however, the law is not so simple. It appears that the cases in this area turn on formalistic distinctions reminiscent of those found in the law of future interests; the application of the Statute of Frauds often involves the form of a contract as much as its substance. For example, a promise to serve as an employee for a period of two years is clearly within the Statute, even though service as an employee is obviously conditioned on the continuing existence of the employee. Williston on Contracts § 499, at 606 (3d ed. W. Jaeger 1960 & Supp.1980). On the other hand, a promise to serve as an employee as long as the employee lives, but not for more than two years, is just as clearly outside the Statute. *Id.* While it is true that both promises are in substance equivalent, the Statute applies to one but not the other. "To the criticism that the distinction is more technical than substantial, it may well be answered that the ancient statute is itself rather technically worded." *Id.* at 605 (quoting *Chevalier v. Lane's, Inc.,* 147 Tex. 106, 213 S.W.2d 530, 532 (1948)).

The case of a promise impliedly conditioned on the continued existence of a business entity is evidently treated the same way. Thus, a promise to pay a percentage of the gross receipts of a partnership for an unlimited duration would be outside of the Statute, whereas the promise to pay for a fixed period exceeding a year from the making of the contract would

out of the Statute by Farrow's performance.[30] We assume, but do not decide, that the contract was within the Statute. Our inquiry is directed solely to the question whether the requirements of the Statute were satisfied by the "Memorandum Agreement."

The "Memorandum Agreement" appears to satisfy the Statute. It is undisputed that it embodies the terms of the contract and, as such, constitutes a suitable "memorandum or note thereof." Furthermore, it is also "signed by the party to be charged therewith or a person authorized by him," because Kaswell, who signed the document, was a partner in the new firm of Cahill and Kaswell and therefore an agent both of the partnership and of his partner.[31] There is no dispute that Kaswell had authority to negotiate and to authenticate the terms of the agreement. So it seems obvious that the Statute is fully satisfied by the "Memorandum Agreement."

Nonetheless, it is worth noting possible confusions that might momentarily mislead one into questioning whether the situation is more complicated than this straightforward result suggests. These possible confusions arise because Kaswell signed the document *before* the contract came into being— before the "consent of all the present members of the firm" had been obtained—and because Kaswell's signature, while it authenticated the terms of the agreement, did not by itself constitute assent to those terms "by the party to be charged." Indeed, the terms of the memorandum explicitly indicate that Kaswell did not have authority to give the partnership's assent to the contract; effective assent required the consent not only of Kaswell but also of Cahill.

■ Neither of these observations affects the result that the Statute of Frauds has been satisfied, however. The Statute does not require that the "contract" itself be in writing *or* that the signature of the party to be charged be affixed to the writing as the operative, legally effective act of as-

---

be inside the Statute. *Id.* § 495, at 582–83. The "Memorandum Agreement" specifies that it will remain in effect until either 31 December 1980 or 31 December 1990, the year recorded in the handwritten memorandum being a point of dispute between the parties. But in either case a period exceeding a year is explicitly referred to in the agreement. Thus under the conventional treatment of the Statute of Frauds, this agreement would be within the Statute. There are, however, no District of Columbia cases we have been able to find on this point. Given our resolution of the Statute of Frauds question in this case, we are not required now to speculate whether the District would or would not follow the conventional interpretation of the Statute.

30. In reaching its conclusion that Farrow's performance of his side of the bargain took the contract out of the Statute the trial court relied on a trio of District of Columbia cases, *Brown v. Brown*, 343 A.2d 59 (D.C.1975) (per curiam) (contract effecting divorce settlement brought outside the Statute when the husband withdrew to his prejudice countersuit in divorce proceeding as his part of oral agreement); *Amberger & Wohlfarth, Inc. v. District of Columbia*, 300 A.2d 460 (D.C.1973) (oral agreement between landlord and tenant that there would be five successive renewals of a one-year lease brought out of the Statute by the tenant's extensive renovations in reliance on the promise); and *Schanck v. Jones*, 229 F.2d 31 (D.C.Cir. 1956) (abandonment of appeal in divorce case

as part of oral settlement brings agreement outside of the Statute). The appellee attempts further to buttress the trial court's position by citing *Autera v. Robinson*, 419 F.2d 1197, 1198 n.1 (D.C.Cir. 1969) (quoting *Schanck* to support the proposition that compromising a legal proceeding is sufficient part performance to take an oral agreement outside of the Statute), and *Zanakis v. Brawner Bldg., Inc.*, 377 A.2d 67, 70 (D.C.1977) (Harris, J., concurring in part and dissenting in part from *per curiam* opinion) (detrimental reliance resulting from an oral promise to extend a lease term may bring the promise outside the Statute of Frauds). Each of these cases involves the element of substantial detrimental reliance by the plaintiff on an oral agreement. We cannot say whether the performance by Farrow of part or even all of his part of the bargain would amount, under District of Columbia law, to such detrimental reliance as would bring the "Memorandum Agreement" outside of the Statute. In view of our decision that the memorandum satisfied the Statute, however, we are not required to decide this question.

31. *See, e. g., Philips v. United States*, 59 F.2d 881, 887 (D.C. Cir.), *cert. denied*, 287 U.S. 639, 53 S.Ct. 88, 77 L.Ed. 553 (1932) (a partner is both "an agent for the partnership" and "an agent for the other partner").

sent.[32] The Statute attempts to provide a measure of protection against fraud but it stops well short of requiring that the contract itself be in writing. The Statute does not impose an additional requirement as to what constitutes a valid contract,[33] but only that certain enumerated contracts must be evidenced by a "memorandum or note thereof . . . signed by the party to be charged therewith or a person authorized by him."

For this reason, the "memorandum or note" required by the Statute need not be made by the parties as an expression of the contract or signed with the intention of assenting to the contract's terms in order to satisfy the Statute. The Statute is satisfied even by a letter which purports to repudiate or cancel an otherwise valid oral agreement, or which refuses to enter a written contract after an oral agreement was reached.[34] Generally, the purpose for which a memorandum was prepared and the intent with which it was signed are simply immaterial to determining whether the Statute has been satisfied. Thus, the fact that Kaswell did not and could not by

his act of signing the "Memorandum Agreement" give his partnership's assent to the contract does not decide the sufficiency of the document in satisfying the Statute.

Nor does it matter that the document was prepared and signed prior to the time at which the contract became effective—the moment at which the consent of "all the present members of the firm" was obtained. It is well settled that a memorandum satisfying the Statute may be made before the contract is concluded.[35] For example, a written offer signed by the offeror is sufficient to satisfy the Statute in a suit against the offeror to enforce the agreement, even though the offeree subsequently accepted the offer only orally.[36] The written offer clearly authenticates the terms on which the offeror was willing to contract and that is sufficient to satisfy the Statute as a "memorandum or note . . . signed by the party to be charged therewith or a person authorized by him."

An attempt might be made to distinguish from the present case those in which written offers have been held sufficient to satis-

---

**32.** Restatement (Second) of Contracts § 209 (Tent. Draft No. 4, 1968) ("the Statute may be satisfied by a signed writing not made as a memorandum of a contract"); *id.* at Comment a ("The rule of this Section reflects the general assumption that the primary purpose of the Statute is evidentiary, that it was not intended to facilitate repudiation of oral contracts."); Restatement (First) of Contracts § 209 (1932) ("It is not essential to the validity of a memorandum under the Statute that the writing shall have been made as a memorandum of a contract."); Williston on Contracts § 579, at 115–16 (3d ed. W. Jaeger 1960 & Supp. 1980).

**33.** "[T]he Statute presupposes an existing oral contract the enforcement of which is suspended until the Statute is satisfied by the reduction of it to a writing." Williston on Contracts § 448, at 342 (3d ed. W. Jaeger 1960 & Supp. 1980) (citation omitted).

**34.** Restatement (Second) of Contracts § 209, Comment c at 247–48 (Tent. Draft No. 4, 1968) ("A signed writing which is otherwise a sufficient memorandum of a contract is not rendered insufficient by the fact that it also repudiates or cancels the contract, or asserts that it is not binding because not in writing. But a writing denying the making of the contract is not a memorandum of it."); *id.* at Illustration 4 ("A

writes and signs a letter to B in which he states accurately the terms of the bargain, but adds 'our agreement was oral. It, therefore, is not binding upon me, and I shall not carry it out.' The letter is a sufficient memorandum to charge A."); Restatement (First) of Contracts § 209 (1932); Williston on Contracts § 579, at 116 (3d ed. W. Jaeger 1960 & Supp. 1980) ("the requirement of a 'note or memorandum' is satisfied by a letter which refuses to enter into a written contract, or, after admitting the existence of the oral contract and stating its terms accurately, repudiates or cancels it") (citations omitted).

**35.** Restatement (Second) of Contracts § 214 (Tent. Draft No. 4, 1968) ("A memorandum sufficient to satisfy the Statute may be made or signed at any time before or after the formation of the contract."); Williston on Contracts § 590 at 193–94 (3d ed. W. Jaeger 1960 & Supp. 1980) (a memorandum "may be made even before the contract is concluded").

**36.** Restatement (Second) of Contracts § 214, Comment a (Tent. Draft No. 4, 1968); Restatement (First) of Contracts § 209, Illustration 3 (1932); Williston on Contracts § 590 at 194 (3d ed. W. Jaeger 1960 & Supp. 1980).

# 210

fy the Statute by pointing out that whereas an offeror has, by making the offer, expressed his consent to the terms of the offer, Kaswell was not empowered to bind his partnership by giving his assent at the time he signed the "Memorandum Agreement." That is, in the case of a written offer the memorandum precedes the contract, but not the assent of the party to be charged; here the memorandum preceded both. This distinction, however, has little functional significance in preventing fraud. The fact that an offeror assented to the terms of his offer at the time of its dispatch does not imply that a contract ever was made, or if made, was made on the terms of the offer. An offeror who has dispatched a written offer by mail, for example, retains the power to withdraw his offer prior to its receipt and acceptance by the offeree. Moreover, the offeree may extinguish his power to accept by first rejecting the offer, or he may simply fail ever to accept it at all. Another possibility is that the offeree may orally make a counteroffer on different terms which are then accepted by the offeror. The law, however, considers none of these possibilities sufficient to provide grounds for rejecting the written offer as satisfaction of the Statute of Frauds. We can see little to distinguish the uncertainty concerning the terms and existence of a contract subsequent to the dispatch of a written offer from the uncertainty concerning the terms and existence of a contract subsequent to the execution of the "Memorandum Agreement" under the circumstances of the present case.

To reiterate the point: the Statute does not require the contract itself to be in writing. In the case of a written offer, the offeree, suing on the contract and entering into evidence the written offer in satisfaction of the Statute, continues to bear the burden of proving the existence of a contract on the terms contained in the document. Similarly in this case, Farrow, suing on his contract with Kaswell and Cahill and offering the written "Memorandum Agreement" in satisfaction of the Statute, bore the burden of independently proving the existence of a contract on the terms of the written document. In neither situation does the fact that the document offered in satisfaction of the Statute was created and signed prior to the time the contract was concluded affect its use in compliance with the Statute.

We find that the "Memorandum Agreement" satisfied the Statute of Frauds. There thus being no cause to reverse the judgment of the trial court, this case is therefore

*Affirmed.*