Norman D. PENICK, et al., Plaintiffs,

v.

FRANK E. BASIL, INC. OF DELA-WARE, et al., Defendants.

Civ. A. No. 82–1413.

United States District Court,
District of Columbia.

Jan. 30, 1984.

Jamie L. Whitten, Wyatt, Saltzstein, Lipsen & Hamberger, Washington, D.C., for plaintiffs.

Patricia H. Wittie, Kirkpatrick, Lockhart, Hill, Christopher & Phillips, Washington, D.C., for defendants.

JOHN LEWIS SMITH, Jr., District Judge.

Plaintiffs Norman D. and Marlene J. Penick bring this action for breach of contract against defendants Frank E. Basil, Inc., and David Descoteau, an employee of the corporate defendant. Plaintiffs allege that defendant Basil offered a two-year contract to plaintiffs regarding employment in its Saudi Arabian operation, that defendant Descoteau personally guaranteed the contract, that plaintiffs accepted and began performance, and that defendants subsequently terminated the contract after only five months. Defendants contend that a Saudi corporation, and not Basil, is the party to plaintiffs' alleged contract, that no personal guarantee was ever made, that enforcement of the contract or the guarantee is barred by the Statute of Frauds, that Norman Penick abandoned his employment, and that plaintiffs failed to satisfactorily prove damages. The case was tried before the Court on November 15–18, 1983. Upon consideration of the testimony of the witnesses, evaluation of the credibility of the witnesses, the exhibits, and the entire record, the Court, pursuant to Fed.R.Civ.P. 52, enters the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1) Plaintiffs Norman D. and Marlene J. Penick, husband and wife, are citizens of the State of California.

2) Defendant Frank E. Basil, Inc. ("Basil") is a Delaware corporation, with its principal place of business in the District of Columbia.

3) Defendant David Descoteau ("Descoteau") is, and at all times relevant has been, employed by Basil as Director of Basil Health Systems, an unincorporated division of Basil.

4) Saudi Maintenance Co. ("Siyanco") is a Saudi Arabian limited liability company. Frank E. Basil, Inc., a Liberian corporation, owns 50% of Siyanco, and the remaining 50% is owned by a Saudi prince, Abdul Rahman bin Abdul Aziz Al-Saud. A document prepared by Descoteau in December 1980, entitled "The Basil Group of Companies[-]Capability Statement[-]Siyanco-Basil Health Systems" describes Siyanco as a Basil "subsidiary," founded in 1968 to "provide an extension of corporate capability and services" in Saudi Arabia. The document states that Siyanco performs "life support, logistics management, facilities maintenance and operations and training projects and programs in Saudi Arabia."

5) In late 1980, Basil and Siyanco maintained an ongoing business relationship of some duration. Basil provided employment recruiting and procurement services for Siyanco, including assistance in obtaining official papers for Siyanco employees from the United States. Basil periodically billed for and Siyanco paid for these services.

6) In late 1980, Siyanco was party to a contract with the United States Army Corps of Engineers to provide operation, maintenance, and medical services at King Khalid Military City, Hafar Al-Batin, Saudi Arabia ("KKMC"). Siyanco intended to terminate its medical services subcontract with Hospital Corporation International, Ltd., and begin performance of those services itself. Consequently, Siyanco sought to hire qualified health services personnel, including an administrator for the KKMC project.

7) In late 1980, Descoteau traveled to Saudi Arabia and began recruiting efforts. Descoteau contacted Michael J. Hurd, who declined an offer of employment at the Siyanco project but provided Descoteau with several names, including that of plaintiff Norman Penick. Descoteau contacted several other candidates regarding the

KKMC position, and offered it to Gary Bell, who declined.

8) In late November and early December 1980, Descoteau contacted Norman Penick, the Health Systems Administrator for Saudi Arabian Parsons, Ltd. ("SAPL"), Yanbu, Saudi Arabia, and discussed the KKMC position.

9) On December 10, 1980, Penick traveled to the Siyanco compound in Riyadh, Saudi Arabia, to meet with Descoteau. Marlene Penick was not present. Numerous signs throughout the compound displayed the name "Siyanco;" there were no signs displaying the name "Basil."

10) On December 10 and 11, 1980, Penick and Descoteau discussed Penick's employment experience and the KKMC position in great detail. Descoteau and Penick discussed the terms of the Siyanco form employment contract, its employee benefits provisions, and the possibility of employment for Marlene Penick.

11) On December 11, 1980, Descoteau, after receiving the approval of Arthur Stephens, Deputy General Manager of Siyanco, prepared a typewritten letter offering employment to Penick.

12) The letter offer was prepared on Siyanco letterhead, offered a position with "our Company," and described the position as "Hospital Executive Director—KKMC-Siyanco." Item 6 of the letter makes reference to the Siyanco form employment contract discussed by Descoteau and Penick. Item 7 refers to a "verbal offer regarding contract deletions," a reference to Penick's insistence in negotiations that a standard 90-day probationary period be waived. The letter conditioned the offer on Penick's obtaining a letter of release from his present employer. The letter concluded:

"Very truly yours,
SAUDI MAINTENANCE COMPANY, LTD. (SIYANCO)
/s/ David A. Descoteau
David Descoteau
Director, Basil Health Systems."

13) The letter offers employment to Norman Penick only; it does not mention or refer to any employment opportunities for Marlene Penick with either Siyanco or Basil. The letter offer makes no reference to any performance bonuses, retirement benefits, or use of a company car.

14) Negotiation and execution of the letter agreement occurred under some time pressure; Penick was in a hurry to catch an airplane for his return to Yanbu. On December 11, 1980, Penick signed the offer and immediately left the Siyanco compound.

15) In late December 1980, Descoteau contacted Penick regarding the status of Penick's efforts to obtain a letter of release from SAPL, his present employer. Penick requested assurances from Descoteau that the employment offer would be honored even if Penick could not obtain the letter of release.

16) On December 23, 1980, Descoteau, after consulting with Stephens, drafted and dispatched a telex to Penick. After identifying Penick as a "consultant to Siyanco," the telex continued: "this is to inform you that Siyanco will honor its commitment to you without your letter of release. See you early January. Regards, David Descoteau, Siyanco Office, Riyadh." Penick picked up the telex at the Athens office of Basil, a site selected by Penick and Descoteau because Penick was vacationing in southern Europe at the time.

17) On January 8, 1981, Penick traveled to the KKMC facility, and met with Rodney Basil, General Manager of Siyanco. Basil and Penick discussed Penick's new position and the status of the KKMC project.

18) On January 10, 1980, the Corps of Engineers issued a cease and desist order to Siyanco to prevent its takeover of medical services at KKMC. On the same day, Penick resigned from his employment at SAPL. Descoteau informed Penick of the Corps' action, and instructed Penick to report to KKMC.

19) On January 16, 1981, Penick and his wife arrived at the Siyanco compound in Riyadh, and Penick commenced employment. In late January and early February

1981, Penick participated in the development of a plan detailing Siyanco's proposed takeover of medical services at KKMC. Penick also participated in several matters relating to Siyanco activities at the Saudi Arabian National Guard Hospital.

20) Penick was paid by Siyanco at least $21,851 (cash) in salary between January and May 1981. Marlene Penick never received any salary, nor did she ever attempt to secure pay or bring the matter to Siyanco or Basil's attention.

21) In March 1981, Penick met his wife and children in the United States, and completed new visa applications. An employee of Basil, Sonia Akar, processed the applications and submitted, over her signature, visa requests on Siyanco letterhead; the requests make no reference to Basil. Akar, in accordance with an apparent common practice, requested a work visa for Marlene Penick because it allowed her to return to Saudi Arabia immediately with her husband. During this visit, Norman Penick met with representatives of an American accounting firm regarding a proposed audit of Siyanco's operations at KKMC.

22) In late March 1981, the Penicks returned to Saudi Arabia. In early April, Norman Penick prepared two documents, an "agenda" for a proposed meeting between Penick and Rodney Basil, and a "memorandum" addressed to "All Siyanco Employees." The agenda indicates Penick's interest in speaking with Rodney Basil about "SIYANCO honor[ing] previous commitments." The memorandum states in part that its purpose "is to announce that Norman D. Penick is the Siyanco Director of Health Services."

23) In late May, in anticipation of a return to the United States to attend his son's high school graduation, Penick submitted a Siyanco "application for leave," stating that he would be out of Saudi Arabia from May 27 to June 9, 1981. The Penicks returned to the United States on May 27.

24) On June 4, 1981, Gary Witte, Director of Marketing for Siyanco, telephoned Descoteau, who was then at the Basil office in Columbia, MD., and asked Descoteau to contact Norman Penick and instruct him to delay his return to Saudi Arabia because of a housing shortage at the Siyanco compound.

25) On June 4, 1981, Penick and Descoteau spoke by telephone. Penick was then at his parents' home in Shadyside, Ohio. Descoteau told Penick that Penick should remain in the United States indefinitely. Penick responded by stating that he had a two-year, no-risk contract, and was entitled to receive his May salary, and that he wanted all further communications to be in writing. Descoteau offered no comment in response to Penick's statement about his pay. In the course of that conversation, Descoteau never told Penick that he was "fired" or "terminated."

26) After the June 4 telephone conversation with Descoteau, Penick received notice from his mother that he had received at least three calls from the Basil office in Washington. Penick's mother recorded the numbers but not the names of the callers. Penick returned the calls but was apparently unable to locate the person or persons who had called him. Penick never attempted to contact Descoteau or anyone at Siyanco.

27) On June 15, 1981, Kamal Daoud, a Siyanco employee working out of Basil's Washington office, sent a telex to Stephens. The telex stated that Daoud had attempted to contact Penick, and was informed that he was "traveling the country."

28) In mid-June, Penick and his family traveled to Cibolo, Texas, to inspect their property there. On June 18, 1981, Penick sent the following telegram to Frank E. Basil:

"Descoteau advised me per A. Stephens' instructions, to remain on furlough in the U.S. until the hospital project is finalized. Requested written confirmation on the instruction have [sic] not been received. Send June's pay check to 575 W 42nd St.,

Shadyside, Ohio 43947 ... [signed] Norman Penick, Basil/Siyanco."

29) On June 20, 1981, a Siyanco employee sent a letter to Daoud, requesting Daoud to inform Penick that he was "overdue from R & R leave" and "must resume duty on 24 June 1981, otherwise your services will be terminated according with regulations." Penick testified that he never received this message.

30) After sending the June 18 telegram, Penick and his family traveled to California, where he accepted employment with American Medical International, Inc., on July 8, 1981. Marlene Penick did not seek or accept employment.

## CONCLUSIONS OF LAW

1) Jurisdiction is proper in this Court under 28 U.S.C. § 1332.

2) Because jurisdiction is based on diversity of citizenship, the governing law is that of the District of Columbia. *See Anchorage-Hynning & Co. v. Moringiello,* 697 F.2d 356, 360 (D.C.Cir.1983); *Lee v. Flintkote Co.,* 593 F.2d 1275, 1278–79 n. 14 (D.C.Cir.1979).

■ 3) Under District of Columbia law: "An action may not be brought to charge ... a person ... upon an agreement that is not to be performed within one year from the making thereof, unless the agreement upon which the action is brought, or a memorandum or note thereof, is in writing, which need not state the consideration and signed by the party to be charged therewith or a person authorized by him." D.C.Code Ann. § 28–3502.

Plaintiffs' alleged employment contract with Basil has a two-year term; consequently, it is within the Statute. The only writings offered by plaintiffs in satisfaction of the Statute are the December 11, 1980, letter offer, and the December 23, 1980, telex. Although the District of Columbia Statute of Frauds does not require that the "contract" itself be in writing, *see Farrow v. Cahill,* 663 F.2d 201, 208 (D.C. Cir.1980), it does require that the writing

set forth the "essential terms" of the agreement, *see Easter v. Kass-Berger,* 121 A.2d 868, 870 (D.C.Mun.App.1956); *Educational Enterprises v. Greening,* 265 A.2d 287, 289 (D.C.App.1970); *Farrow v. Cahill, supra,* 663 F.2d at 208, and adequately identify the parties to the contract. *See generally* Farnsworth, *Contracts* 409 (1982). Under these standards, plaintiffs' contract with Basil is unenforceable. First, on its face, the December 11 letter identifies Siyanco, not Basil, as the offeror. The offer is on Siyanco letterhead and refers to a position with Siyanco. Similarly, the December 23 telex indicates that "Siyanco will honor its commitment." There is simply nothing in the writings identifying Basil as the *offeror.* Second, even if Basil is a party, the writings do not contain all the "essential terms" of the alleged contract. Most important and obvious is the lack of any reference whatsoever to Basil [or Siyanco] employment of Marlene Penick. There is nothing in the writings regarding her identity, the nature of any job, or the duration of that employment. Plaintiffs have offered no writing whatsoever "establish[ing]" that there in fact *was* an agreement" with *Basil. Hackney v. Morelite Construction Co.,* 418 A.2d 1062, 1065 n. 1 (D.C.App.1980) (emphasis in the original). Consequently, in order to establish liability on the part of Basil, plaintiffs must rely on the evidence of Basil's relationship with Siyanco.

■ 4) Under District of Columbia law, an agent is not liable on a contract it executes on behalf of its principal if the agent: 1) identifies the principal; and 2) discloses the agency relationship. *See Henderson v. Phillips,* 195 A.2d 400, 401–02 (D.C.App.1963); *Pryme Construction Corp. v. Nickolson,* 193 A.2d 739, 740 (D.C. App.1963); *Resnick v. Abner B. Cohen Advertising,* 104 A.2d 254, 255 (D.C.Mun.App. 1954); *see also Rittenberg v. Donohoe Construction Co., Inc.,* 426 A.2d 338, 341 (D.C.App.1981). The disclosure requirement is satisfied if at the time of the transaction, the other party had "notice that the agent is acting for a principal and of the

principal's identity." *Henderson v. Phillips, supra,* 195 A.2d at 402, *quoting Restatement (Second) of Agency* § 4 (1958). *See also id.* § 9 (broadly defining "notice"). Finally, the burden of proving an agency relationship—*i.e.,* that one person "authoriz[ed] another to act on his behalf subject to his control and the other consent[ed] to do so," *Smith v. Jenkins,* 452 A.2d 333, 335 (D.C.App.1982)—"rests with the party asserting the relationship." *Edmund J. Flynn Co. v. LaVay,* 431 A.2d 543, 548 (D.C.App.1981). *See also Smith v. Jenkins, supra,* 452 A.2d at 335; *Johnson v. Bechtel Associates Professional Corp.,* 717 F.2d 574, 579 (D.C.Cir.1983), *cert. granted sub nom. WMATA v. Johnson,* — U.S. —, 104 S.Ct. 972, 79 L.Ed.2d 210 (1984).

■ Defendants have proven the existence of an agency relationship between Basil and Siyanco. The evidence reveals that Basil provided various services, including employee recruitment, for Siyanco over a number of years, and was compensated for those efforts. In particular, defendants have shown that they were acting on behalf of Siyanco at the time of the events in issue. Basil's employee Descoteau was sent to Saudi Arabia for the specific purpose of recruiting employees for Siyanco. During the course of negotiations with plaintiff on December 10–11, and again with respect to the December 23 telex, Basil's employee Descoteau sought the approval of a Siyanco official, Arthur Stephens. Furthermore, there is no question that plaintiff was on "notice" of the agency relationship. First, the negotiations took place at a plainly-identified Siyanco compound. Second, the letter offer was on Siyanco letterhead, and referred only to Siyanco. Third, plaintiff discussed the position with Stephens, a Siyanco officer, and knew of Descoteau's meetings with Stephens. Fourth, the other candidates approached by Descoteau have testified that Descoteau made clear to them that the position was with Siyanco, not Basil, and that Descoteau was recruiting on behalf of Siyanco. In summary, the evidence reveals that Basil had consented to and was acting at the direction of a disclosed principal. Consequently, Basil cannot be held liable for Siyanco's contract under principles of agency law.

■ 5) Under District of Columbia and general principles of corporation law, shareholders of a corporation generally are not liable on a contract made by the corporation; the "corporation is an entity separate and distinct" from its shareholders. *Harris v. Wagshal,* 343 A.2d 283, 287 (D.C. App.1975). *See also McAuliffe v. C and K Builders,* 142 A.2d 605, 607 (D.C.Mun.App. 1958); *Labadie Coal Co. v. Black,* 672 F.2d 92, 96–100 (D.C.Cir.1982). A "party seeking to disregard the corporate entity has the burden of showing by *affirmative proof* that a unity of ownership and interest exists and that the corporation was created or used for the purpose of perpetrating fraud or wrong." *McAuliffe v. C and K Builders, supra,* 142 A.2d at 607 (emphasis in the original). Similar rules obtain where a plaintiff seeks to impose liability on a parent corporation for a contract made by its subsidiary. *See* 13A Fletcher, *Cyc. Corp.* § 6222 (1982); *Baker v. Raymond Int'l, Inc.,* 656 F.2d 173, 179– 80 (5th Cir.1981). In the parent-subsidiary context, plaintiff must prove that the parent exercises such control over the subsidiary that the subsidiary has become its "mere instrumentality." *C M Corporation v. Oberer Development Corp.,* 631 F.2d 536, 538 (7th Cir.1980). *See also Baker v. Raymond Int'l, Inc., supra,* 656 F.2d at 179; *Berger v. Columbia Broadcasting System,* 453 F.2d 991, 994–96 (5th Cir. 1972); *Edwin K. Williams & Co. v. Edwin K. Williams, Etc.,* 542 F.2d 1053, 1063 (9th Cir.1976); 1 Fletcher, *supra,* at § 43. Courts generally consider a familiar list of factors in determining whether to look beyond the subsidiary to its parent. *See C M Corporation v. Oberer Development Corp., supra,* 631 F.2d at 539 (citations omitted); *Labadie Coal Co. v. Black, supra,* 672 F.2d at 96–99; 1 Fletcher, *supra,* at § 41–30 (listing factors). *See, e.g., Northern Illinois Gas Company v. Total*

*Energy Leasing Corp.*, 502 F.Supp. 412, 417–19 (N.D.Ill.1980).

■ The corporate-level relationship between Basil and Siyanco is at the heart of this case. Basil is potentially liable on the Siyanco contract if plaintiff has shown by "affirmative proof," *C and K Builders*, *supra*, that, as alleged, Siyanco is "so directed by Basil in the interests of Basil that both companies must be considered as a single entity." There is evidence of a very close relationship between Basil and Siyanco. First, ownership of Siyanco stock is jointly held by Frank E. Basil, Inc. of Liberia, and by a Saudi prince. As noted, a document prepared by Descoteau indicates that Siyanco was founded in 1968 to "provide an extension of [Basil] corporate capability" in Saudi Arabia, and that Basil provides "all managerial, technical and financial support available from parent company as required to ensure successful accomplishment of all SIYANCO projects...." (*see supra* Finding of Fact ¶ 4).

Second, Basil in fact performs numerous services for Siyanco, including recruitment of Siyanco employees. Basil and Siyanco employees frequently work together on various projects, and at each other's facilities in Saudi Arabia and the United States. Basil employees prepared numerous documents where the names "Basil" and "Siyanco" appeared together, or suggested that an employee of one corporation was also an employee of the other. For example, a Basil employee responsible for visa processing signed and submitted visa requests on both Basil and Siyanco letterheads, without indicating any agency relationship (*see supra* Finding of Fact ¶ 21). Similarly, Descoteau signed the December 23 telex as "David Descoteau, Siyanco Office, Riyadh." (see *id.* at ¶ 16).[1]

None of these factors, however, is dispositive of the instrumentality issue. Stock ownership, of course, is "only one factor among many." *Baker v. Raymond Int'l, Inc.*, *supra*, 656 F.2d at 181.[2] *See also Harris v. Wagshal*, *supra*, 343 A.2d at 287.

With respect to the ongoing business relationship between Basil and Siyanco, plaintiffs failed to show that the dealings between the companies were not conducted on an arms-length basis, or that the employees of either failed to observe proper corporate formalities. *See Coastal States Trading, Inc. v. Zenith Navigation S.A.*, 446 F.Supp. 330, 337 (S.D.N.Y.1977). Indeed, defendant offered evidence that Basil periodically billed for and Siyanco paid for Basil's activities on behalf of Siyanco, and that each entity maintained separate financial records. Siyanco employees, including Norman Penick, were paid from Siyanco funds. There was no evidence that Basil "finances" Siyanco. There was no evidence that Siyanco was grossly undercapitalized, or of commingling or diversion of funds. There was no evidence of common directors or officers. There was no compelling evidence of "total domination," or

---

1. Plaintiffs point to this evidence, and to Norman Penick's testimony (vigorously denied by defendants) that Descoteau on several occasions represented that Basil and Siyanco were the "same thing," in an apparent but unarticulated effort to raise an estoppel issue. In some circumstances, "related but separate corporations may be estopped by their words and conduct to assert their separateness." 1 Fletcher, *supra* § 47, at 559. The doctrine typically applies where the plaintiff was not on notice that separate entities existed, a situation not present in this case. Fletcher notes, however, that such representations may be considered by a court in determining whether to pierce the veil and hold a parent corporation liable. *Id.* *Cf. Edwin K. Williams & Co. v. Edwin K. Williams, Etc.*, *supra*, 542 F.2d at 1063.

2. The decision in *Baker* is noteworthy for several reasons. *Baker* involved quite similar facts; the defendant, an American corporation, shared ownership (through a wholly-owned foreign subsidiary) of a Saudi company with a number of Saudi princes. The Court noted that the "reason, business or otherwise, for this complex arrangement, does not appear in the record." 656 F.2d at 177. The defendant performed recruiting and procurement services for the Saudi company. Plaintiff, an employee of the Saudi company, sought to establish that the American corporation was his "actual" employer. In evaluating this similar Saudi-American corporate structure, the Court employed traditional corporate veil analysis, and noted that only "exceptional circumstances" justify imposition of liability on a parent corporation. *Id.* at 179–80.

that Siyanco "manifests no corporate interests of its own."

In summary, the evidence reveals that Basil and Siyanco are closely-related corporate entities. Many aspects of their relationship are marked by the "informality that comes from constant association," *Coastal States Trading, Inc., supra,* 446 F.Supp. at 337, and, apparently, from the conditions of doing business in Saudi Arabia. Plaintiffs, however, have failed to prove that Siyanco is the "mere instrumentality" of Basil. "Penetration of the corporate veil is a step to be taken cautiously," *Quinn v. Butz,* 510 F.2d 743, 759 (D.C.Cir. 1975), and a power to be "exercised reluctantly," *C M Corporation v. Oberer Development Co., supra,* 631 F.2d at 541. The Court in its discretion, *see Valley Finance, Inc. v. United States,* 629 F.2d 162, 172 (D.C.Cir.1980) concludes that exercise of that power is not warranted on the evidence adduced at trial. Consequently, Basil cannot be held liable on Siyanco's contract with plaintiffs.

6) Under District of Columbia law, even if Basil could be held liable on either agency or corporate relationship grounds, plaintiffs' contract with Siyanco is unenforceable under the D.C. Statute of Frauds, D.C. Code Ann. § 28–3502. As noted *supra* at ¶ 3, the December 11 letter offer and the December telex are an insufficient memorandum of the agreement because they do not embody all the "essential terms" of the agreement. Furthermore, even if Marlene Penick's alleged employment is regarded as a matter of a separate contract, rather than as a term of her husband's contract, plaintiffs offered no writing whatsoever in satisfaction of the Statute.[3]

■ 7) Finally, the alleged promise of Descoteau to personally guarantee the plaintiffs' employment contract is unenforceable under the Statute. D.C.Code Ann. § 28–3502 provides that any agreement to "answer for the debt [or] default" of another must be evidenced by a writing. *See Hudson v. Ashley,* 411 A.2d 963, 967 (D.C.App.1980). *See also Keane v. Gartrell,* 334 F.2d 556, 557 (D.C.Cir.1964). Plaintiff failed to produce any writing embodying a guarantee by Descoteau and signed by him. Furthermore, plaintiff neither invoked nor demonstrated the applicability of the "leading object" exception to the Statute, *see Hudson v. Ashley, supra,* 411 A.2d at 967–68, and Descoteau vigorously denied making any such promise. In summary, any contract between Siyanco (or Basil) and plaintiffs, or between Descoteau and plaintiffs, is unenforceable under the provisions of D.C.Code Ann. § 28–3502.

8) In view of the Court's conclusions that: 1) Basil is not a party to any employment contract; 2) Basil is not liable on either agency or corporate-level grounds for contracts made by Siyanco; 3) even if Basil is liable for Siyanco contracts, plaintiffs' contract is unenforceable under the Statute of Frauds; and 4) any personal guarantee by Descoteau is also unenforceable under the Statute of Frauds, the Court need not reach the issues raised by the alleged termination of plaintiffs' contract, plaintiffs' alleged abandonment of employment or plaintiffs' failure to properly prove damages. The record in this case reveals a pattern of hurried actions, misunderstandings, and frustration throughout plaintiffs' relationship with defendants and Siyanco. Plaintiffs, however, have failed to show that the events of that troubled relationship give rise to legal liability on the part of Basil or Descoteau. Consequently, the Court finds that defendants are not liable for breach of contract.

Accordingly, judgment shall be entered for the defendants.

An appropriate order follows.

---

3. Plaintiffs cannot escape the Statute of Frauds by relying on the part performance or detrimental reliance exceptions. Under District of Columbia law, the part performance and promissory estoppel exceptions to the Statute of Frauds are apparently limited to actions for equitable relief, and are not available in cases involving money damages. *See Landow v. Georgetown-Inland West Corp.,* 454 A.2d 310, 314 n. 4 (D.C. App.1982). *See also Amberger & Wohlfarth, Inc. v. District of Columbia,* 300 A.2d 460, 463 (D.C. App.1973); *Tauber v. Jacobson,* 293 A.2d 861, 866 (D.C.App.1972); *Hackney v. Morelite Construction Co., supra,* 418 A.2d at 1066.